[No. 3073. Oct. 9, 1925.]

DAVY v. McNEILL et al.

[240 Pac. 482.]

### SYLLABUS BY THE COURT

1. The title, "An act in relation to irrigation districts" to chapter 41 of the New Mexico Session Laws of 1919 clearly expresses the subject of said act as contemplated by section 18, article 4 of the Constitution of New Mexico.

2. Section 1 of Chapter 41 of the New Mexico Session Laws of 1919 does not violate section 18, article 2, and section 24, article 4, of the Constitution of the State of New Mexico, nor the Fourteenth Amendment to the Constitution of the United States.

And the same is not class legislation.

Any legislative classification that is, or could seem reasonable to the Legislature, does not violate the Fourteenth Amendment to the Constitution of the United States.

The Legislature of a state has a wide range of discrimination in classifying, and it is sufficient to satisfy the demands of the Constitution if the classification is practical and not palpably arbitrary.

A "general law" is one that operates on all objects of legislation distinguished by reasonable classification. It must be general in its application to a partncular class and all of the class within like circumstances.

Chapter 41 of the New Mexico Session Laws of 1919 is a general law.

3. Section 4 of chapter 41 of the New Mexico Session Laws of 1919 gives a sufficient opportunity for property owners to be heard after notice on the question of benefits, or whether or not land proposed to be taken in an irrigation district would in fact be benefited, and said law does not violate the "due process of law" provision of the federal and state Constitutions.

4. The fact that only resident freeholders may sign the initiatory petition for creating an irrigation district under chapter 41 of the New Mexico Session Laws of 1919 does not deprive an owner of property without due process of law. Section 3 of said act is permissive, and does not exclude any authorized person from representing landowners.

5. The fact that the lands included in an irrigation district organized under chapter 41 of the New Mexico Session Laws of 1919 are assessed on a rate per acre basis is not repugnant to any provision of the Constitution of New Mexico or of the United States.

6. Section 5 of chapter 41 of the Session Laws of 1919, providing for certain qualifications for electors in irrigation districts, is not repugnant to section 1, article 7, of the Constitution of New Mexico, as officers of such irrigation districts are not "public officers" as contemplated by said provision of the Constitution of New Mexico.

Irrigation districts organized under chapter 41 of the New Mexico Session Laws of 1919, are not "municipal corporations" in the sense used in section 13 of article 4, or in section 3 of article 8 of the state Constitution.

7. By "a majority of the qualified electors," as used in section 15 of chapter 41 of the New Mexico Session Laws of 1919, is meant a majority of the qualified electors actually voting, and not a majority of the qualified electors of an irrigation district.

8. Section 4 of chapter 41 of the New Mexico Session Laws of 1919 does not require separate and distinct orders allowing the prayer of the petition and defining and establishing the boundaries and designating the name of a proposed irrigation district.

9. Where the polls at an irrigation district election were kept open from 8 o'clock a. m. to 6 o'clock p. m. instead of from 9 o'clock a. m. to 6 o'clock p. m. as required by the general election laws of the state, and it appears from the evidence that all the votes were cast for the irrigation bonds being voted upon, and there is nothing to indicate there wuld have been any change in the result if the polls had not been opened until 9 o'clock, there being no claim- of fraud or ulterior motives, the election was not void.

10. In this case, the petition filed with the board of county commissioners complied with section 1 of chapter 41 of the New Mexico Session Laws of 1919.

11. In this case the outside boundary of the district was sufficiently described by metes and bounds to comply with chapter 41 of the New Mexico Session Laws of 1919.

12. A bond which provides: "Now, therefore, if the principal does not pay to the county of Valencia, all costs incurred," etc., will be held to be binding, and that the word "not" was a clerical error, and that it was the intention of the parties to make a statutory bond, and they are bound by their evident intention.

13. Section 4 of chapter 41 of the New Mexico Session Laws of 1919 is complied with in defining the boundaries of the proposed district by the board of county commissioners, although reference is made to the initial petition for the boundaries.

14. A contract by landowners to convey their claims of water rights to an irrigation district, conditioned upon the organization of such district within a reasonable time, is valid.

15. Prior to voting upon the issuance of bonds under section 15 of chapter 41 of the New Mexico Session Laws of 1919 it is necessary that an estimate of the money required be determined and based upon some definite plan for the construction of the irrigation system for which such bonds are to be issued.

16. Where all the members of the board of directors are present and attending a meeting of an irrigation district organized under chapter 41 of the New Mexico Session Laws of 1919, held for the disposition of the business of said district, the acts done in such meeting are not void, although the meeting was not formally "called."

17. The fact that the board of county commissioners canvassed the returns of the election held, as provided by section 15 of chapter 41 of the New Mexico Session Laws of 1919, after the same had been canvassed by the directors of the irrigation district, does not render such election void.

18. The provision of section 51 of chapter 41 of the New Mexico Session Laws of 1919 for the publication of a notice of election for "three successive weeks in a newspaper," etc., requires a publication in three successive issues of the newspaper, and does not require a publication for three full weeks, or 21 days.

19. Chapter 41 of the New Mexico Session Laws of 1919 makes no provision for notice to landowners and hearing upon the enforcement and levy of assessments against the lands benefited to obtain funds for paying interest and retiring bonds; the Legislature having provided that such assessment be based upon a rate per acre basis, and is purely a matter of mathematical calculation, and no notice to landowners and hearing is necessary, and is not on that account repugnant to the Fourteenth Amendment to the Constitution of the United States and the like provision of the Constitution of New Mexico.

Appeal from District Court, Sierra County; Owen, Judge.

Suit by Thomas Davy against T. J. McNeill and others, constituting the Board of Directors of the Bluewater-Toltec Irrigation District and others, to enjoin issuance of bonds of the district. Judgment for defendants, and plaintiff appeals. Affirmed.

This is an action in equity brought by the appellant (plaintiff below) Thomas Davy, against T. J. McNeill

and others, being the president, secretary, and board of directors of Bluewater-Toltec irrigation district, the said district, and T. J. McNeill, W. A. Thigpin, and H. J. Haverkampf. Its object was to enjoin the issuance of certain bonds the said Bluewater-Toltec irrigation district, defendant, in preparing to issue under the authority given such irrigation districts by chapter 41 of the New Mexico Session Laws of 1919, under which the Bluewater-Toltec irrigation district was organized, or attempted to be organized. This act of the Legislature itself is attacked upon many constitutional grounds, both state and federal. Also the organization of the district as well as the proceedings for issuing the bonds are attacked on certain legal grounds mentioned in the opinion.

Chapter 41 of the New Mexico Session Laws of 1919 was an amendment of chapter 109 of the Session Laws of 1909. Both the Session Acts of 1909 and 1919 mentioned are largely copied verbatim from what is known as the "Wright Irrigation Act" of the laws of the state of California (St. 1887, p. 29). This act has been before the California courts and the federal courts many times; and a number of the constitutional questions raised in this case have been determined by those courts.

It will be unnecessary here to state specifically the various grounds alleged for obtaining the relief sought, as these will appear in the opinion. The parties will be designated "plaintiff" and "defendant" as they appeared in the court below.

Downer & Keleher, of Albuquerque, for appellant.

Reid, Hervey & Iden, of Albuquerque, for appellees.

OPINION OF THE COURT

BRICE, District Judge (after stating the facts as above). [1] 1. Chapter 41 of the New Mexico Session Laws of 1919 is a comprehensive act, providing for the organization of irrigation districts in New Mexico. The

subject of the act as stated in the title is "An act in relation to irrigation districts." Section 16, article 4, of the New Mexico Constitution, is:

"The subject of every bill shall be clearly expressed in its title, and no bill embracing more than one subject shall be passed except general appropriation bills and bills for the codification or revision of the laws; but if any subject is embraced in any act which is not expressed in its title, only so much of the act as is not so expressed shall be void."

The object of the act is to provide a means for the organization of irrigation districts in New Mexico. There is nothing in the act that does not relate to irrigation districts.

"The general purpose of these provisions (referring to constitutional provisions) is accomplished when the law has but one general object which is fairly indicated by its title. * * * Accordingly, it has been held that the title of "An act to establish a police government for the city of Detroit" was not objectionable for its generality when all matters properly connected with the establishment and efficiency of such a government, including taxation for its support and courts for the examination and trial of offenders, might constitutionally be included in the bill under this general title. * * * The generality of the title is therefore no objection to it so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment could be considered as having a necessary or proper connection. The Legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title in defining it. * * *" Cooley on Constitutional Limitations (7th Ed.) p. 205.

These views are quoted with approval by the Supreme Court of New Mexico in the case of the State of New Mexico v. Ingalls, 18 N. M. 211, 135 P. p. 1177. Also:

"It is primarily for the Legislature to determine whether the title of an act shall be broad and general or narrow and restricted. The greater and broader the title, the greater the number of particulars or of subordinate subjects which may be embraced within it. * * * The constitutional requirement is not directed against the generality and comprehensiveness of titles, and its particulars are satisfied when the law is to be one general subject or object which is completely indicated in its title. So long as the title is not made a cover for legislation incongruous in itself, and the title is not misleading or deceptive, but fairly expresses the general subject or object of the law, the mere generality of the title is not an objection." 25 R. C. L. title "Statutes," § 99.

It is stated in State v. Ingalls, supra:

"In our opinion, the true test of the validity of a statute under this constitutional provision is: Does the title fairly give such reasonable notice of the subject-matter of the statute itself as to prevent the mischief intended to be guarded against? If so, the act should be sustained."

The mischief to be guarded against, as stated by Mr. Cooley, is:

"First, to prevent hodgepodge or log-rolling legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles give no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and third, to fairly apprise the people of the subjects of legislation in order that they may have an opportunity of being heard thereon." Cooley on Constitutional Limitations (7th Ed.), p. 205.

We hold that the subject of this act is clearly stated in the title, as contemplated by the Constitution.

[2] 2. Section 1 of chapter 41 of the Session Laws of 1919 reads as follows:

"Section 1. Whenever a majority of the resident freeholders owning more than one-half of the lands or the evidence of title to said lands in any district in the state of New Mexico desire to provide for the irrigation of the same they may propose the organization of an irrigation district under the provisions of this act, and when so organized each district shall have the powers conferred or that may hereafter be conferred by law upon such irrigation districts; Provided, that where ditches, canals or reservoirs were constructed before March 18, 1909, such ditches, canals, reservoirs and franchises and the lands irrigated therefrom shall be exempt from the operation of this act, unless such district be formed to purchase acquire or lease such ditches, canals, reservoirs and their franchises, or unless a statement, signed by at least four-fifths in number of the owners of any such ditch, canal or reservoir and of the franchises and water rights thereof and of the lands irrigated therefrom, be filed with the board of county commissioners of each county in which such ditch, canal, reservoir and lands are situate, giving their consent that such ditch, canal, reservoir, franchises, water rights and lands may be included in one or more irrigation districts organized or to be organized under the provisions of this act, which statement shall be recorded in the office of the county clerk of said county."

It is claimed that this section provides for an improper and illegal classification of lands and persons

so that it violates a constitutional provision to the effect that all laws of a general nature shall have a uniform operation (we have no such provision in our Constitution); and that it is in violation of section 18, article 2, and of section 24 of article 4, of the Constitution of the state of New Mexico, and of the Fourteenth Amendment to the Constitution of the United States.

A general law for the organization of irrigation districts was passed in 1909, same being chapter 109 of the Session Laws of that year. Section 1 of said act provided:

"That where ditches, canals or reservoirs have been constructed before the passage of this act, such ditches, canals, reservoirs, franchises, and the lands watered thereby, shall be exempt from the operation of this law, except such districts shall be formed to purchase, acquire, lease or rent such ditches, canals, reservoirs and their franchises."

The above-quoted section 1 of the act of 1909 was amended by chapter 24 of the Session Laws of 1912, to read as the law now reads, except as to a matter of recording immaterial to the issues here.

The section of the act of 1919 in question excepts irrigation systems constructed before the act of 1909 became effective, unless a new district be formed to purchase such irrigation systems; in which case, of course, the purchase, acquisition, or lease would depend upon the individuals who own such exempted property. It further provides:

"Or unless a statement, signed by at least four-fifths in number of the owners of any such ditch, canal or reservoir and of the franchises and water rights thereof and of the lands irrigated therefrom, be filed with the board of county commissioners of each county in which such ditch, canal, reservoir and lands are situate, giving their consent that such ditch, canal, reservoir, franchises, water rights and lands may be included in one or more irrigation districts organized or to be organized under the provisions of this act."

Section 18 of article 2, and section 24 of article 4, of the state Constitution, are as follows:

"Sec. 18. No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied the equal protection of the laws."

"Sec. 24. The Legislature shall not pass local or special laws in any of the following cases. (Here follow many subjects on which special laws shall not be passed, none of which relates to the matter in controversy.) In every other case where a general law can be made applicable, no special law shall be enacted."

It will thus be seen that the act separates into two classes those who have established irrigation projects or enterprises prior to the organization of a district under the act. One class consists of those who had established such enterprise prior to the passing of the irrigation act of 1909, and the other class those who had established such enterprises or projects subsequent to that date; the theory of the Legislature evidently being that those who had established such enterprises prior to such date had done so not in contemplation of the fact that they might be included in an irrigation district. While giving them the right to enter their property into such district, the Legislature required that four-fifths of the number of the owners of such ditch, canal, reservoir, and of the franchises and water rights thereof, and the lands irrigated therefrom, give their consent to such inclusion. Those whose irrigation systems were construed after the act of 1909 became effective were treated the same as any other owner of property to be irrigated within the proposed district. The question then is: Are these classifications repugnant to the Fourteenth Amendment to the Constitution of the United States and the like provision of our state Constitution, in the sense that there is an unreasonable or arbitrary discrimination between the two classes of owners? If the classification is reasonable, it is va.lid. It is in the first instance a legislative question as to whether or not the classification is reasonable; that is, could it have seemed reasonable to the Legislature even though such basis seems to the court to be unreasonable, or is it arbitrary and unjust?

"One purpose of the Fourteenth Amendment is to prevent state Legislatures from making discrimination without any

Davy v. McNeill et al., 31 N. M. 7

basis; in other words, to do away with class legislation. Following the decisions of the Supreme Court of the United States upon the subject we have held that there must be some basis for the classification, but that a basis is suffi-. cient, even if it seems unreasonable to the courts, provided there is reason enough for it to support an argument so that it could have seemed reasonable to the Legislature." People, etc., v. Metz, 193 N. Y. 148, 85 N. E. 1070. 24 L. R. A. (N. S.) 201.

"There must be some support of taste, policy, difference of situation or the like, some reason for it even if it is a poor one. * * * The court must be able to see that legislators could regard it as reasonable and proper without doing violence to common sense." People ex rel. Farrington v. Mensching, 187· N. Y. 8, 79 N. E. 884, 10 L. R. A. (N. S.) 625, 10 Ann. Cas. 101.

This question is reviewed by the Supreme Court of the United States in Louisville & Nashville R. R. Co. v. Melton, 218 U. S. 36, 30 S. Ct. 676, 54 L. Ed. 921, 47 L. R. A. (N. S.) 84, also in Orient Insurance Co. v. Daggs, 172 U. S. 557, 19 S. Ct. 281, 43 L. Ed. 552, where it is held that the Legislature of a state has necessarily a wide range of discrimination in distinguishing, selecting, and classifying; that it is sufficient to satisfy the demands of the Constitution if the classification is practical and not palpably arbitrary.

We cannot say that the Legislature acted arbitrarily in making the classifications in question, or that such classification is not reasonable from the Legislature's standpoint. The classification is not repugnant to the Fourteenth Amendment to the Constitution of the United States, nor to section 18 of article 2 of the Constitution of New Mexico, as being class legislation.

To be a general law, it is only necessary that the law be framed in general terms and operate on all objects of legislation distinguished by a reasonable classification. It must be general in its application to a particular class and all of the class within like circumstances.

A general law is one "framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by char-

acteristics sufficiently marked and important to make them a class by themselves.'' Trenton Iron Co. v. Yard, 42 N. J. Law, 357. ''A law is general and uniform if all persons in the same circumstances are treated alike.'' Davis Coal Co. v. Polland, 158 Ind. 607, 62 N. E. 492, 92 Am. St. Rep. 319.

The Constitution of this state does not specifically prohibit the passage of special laws with reference to irrigation districts; and whether or not the provision in section 24 of article 4, ''In every other case where a general law can be made applicable, no special law shall be enacted,'' prohibits the enactment of a special law in this character of legislation it is unnecessary to decide, as the act in question is a general law within the purview of said section 24 of article 4.

[3] 3. It is claimed that section 4 of said act violates the ''due process of law'' provisions of the Constitutions of the United States and New Mexico, in that property owners are not given an opportunity to be heard after notice on the question of benefits, or whether or not the land involved would in fact be benefited. A similar question was before the Supreme Court of the United States in the case of Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369, in construing the ''Wright Act'' of the state of California.

The Supreme Court of the United States in that case said:

"Does it provide for a hearing as to whether the petitioners are of the class mentioned and described in the act and as to their compliance with the conditions of the act in regard to the proceedings prior to the presentation of the petition for the formation of the district? Is there any opportunity provided for a hearing upon notice to the landowners interested in the question whether their lands will be benefited by the proposed irrigation? We think the right to a hearing in regard to all these facts is given by the act, and it has been practically so construed by the Supreme Court of California in some of the cases, above cited from the reports of that court and in the cases cited in the briefs of counsel. We should come to the same conclusion from a perusal of the act. The first two sections

provide for the petition and a hearing. The petition is to be signed by a majority of the holders of title to lands susceptible to one mode of irrigation, etc. This petition is to be presented to the Board of Supervisors at a regular meeting, and notice of intended presentation must be published two weeks before the time at which it is to be presented. The board shall hear the same, shall establish and define the boundaries, although it cannot modify those described in the petition, so as to except from the district lands susceptible to irrigation by the same system of works applicable to the other lands in the proposed district, and the board cannot include in the district, even though included in the description in the petition, lands which shall not, in the judgment of the board, be benefited by irrigation by said system.

"If the board is to hear the petition upon notice, and is not to include land which will not, in its judgment, be benefited by irrigation by the system, we think it follows as a necessary and a fair implication that the persons interested in or who may be affected by the proposed improvement have the right under the notice to appear before the board and contest the facts upon which the petition is based, and also the fact of benefit to any particular land included in the description of the proposed district.    *    *    *

"When the act speaks of a hearing of the petition, what is meant by it? Certainly it must extend to a hearing of the facts stated in the petition, and whether those who signed it are sufficient in number and are among the class of persons mentioned in the act as alone having the right to sign the same. The obvious purpose of the publication of the notice of the intended presentation of the petition is to give those who are in any way interested in the proceeding an opportunity to appear before the board and be heard upon all the questions of fact, including the question of benefits to lands described in the petition. As there is to be a hearing before the board, and the board is not to include any lands which in its judgment will not be benefited, the plain construction of the act is that the hearing before the board includes the question as to the benefits to the lands, because that is one of the conditions upon which the final determination of the board is based, and the act cannot in reason be so construed as to provide that while the board is to give a hearing on the petition it must nevertheless decide in favor of the petitioners, and must establish and define the boundaries of the district, although the signers may not be fifty, or a majority of the holders of title, as provided by the act, and notwithstanding some other defect may become apparent upon the hearing."

Upon reading section 4 of the act in question it will be found to be almost, if not quite, identical in words

and meaning with the California act, in regard to which the same question was presented in the Fallbrook case. It provides for a petition to be filed with the board of county commissioners preliminary to the organization of such a district, the petition to be published in both English and Spanish for two weeks; the hearing to be had almost, if not quite, in the same manner as the hearing provided for by the California law; that the board shall not modify such proposed boundaries prescribed in the petition so as to change its objects, or exempt lands susceptible of irrigation by the same system of irrigation works applicable to other lands in such proposed district; and "nor shall any land which will not in the judgment of the board be benefited by such proposed system be included in such district if the owner thereof shall make application at such hearing to withdraw the same."

This provides for a hearing and the determination of the benefits, so that it does not violate the "due process of law" provision in the federal and state Constitutions.

[4] 4. In section 3 of said act it is stated:

"For the purpose of this act, the term 'resident freeholder' shall be construed to mean any citizen of the United States who owns land within the district or the evidence of title to said land, or who is an entryman under the public land laws of the United States or a purchaser under contract of purchase of state lands, and shall also include corporations, associations and copartnerships owning land within the district. The president or vice-president of such corporation, association, or any member of such copartnership, if a citizen of the United States, may represent such corporation, association or copartnership respectively, in signing such petition or any other petition or protest provided for in this act."

Only resident freeholders may sign the petition to the board of county commissioners for initiating the district. "Resident freeholder" is defined as any citizen of the United States who owns lands within the district, or the evidence of title to such land, or is an entryman under the public land laws of the United States, or a purchaser under contract of purchase of

state lands, and shall include corporations, associations and copartnerships owning land within the district.

It is only in signing the initiatory petition that the signers are limited to resident freeholders as defined by the act. This question was before the Supreme Court of California in Re Bonds of the Madera Irrigation District, 92 Cal. 296, 320, 28 P. 272, 277 (14 L. R. A. 755, 27 Am. St. Rep. 103), in which the court said:

"It is objected to this, that it is placing in the hands of those not interested the power of imposing a burden upon the owners of the land, who may be a small minority of the electors within that district, or who may even be non-residents of the district. This, however, is a matter which was addressed purely to the discretion of the Legislature. Whether such a petition should be made by the owners of a fixed proportion of the land, as was required in the reclamation law, or whether there should be any qualification to the petitioners, or whether there should be any limit to the expenses which they were authorized to incur for the purposes of the improvement, are questions which were solely for the consideration of the Legislature. * * * It must be observed, however, that this petition has no binding operation, but is merely the initiatory step which gives to the board of supervisors a jurisdiction to act upon the expediency or policy of authorizing the creation of the district."

The fact that only resident freeholders may sign the initiatory petition is immaterial, as no property rights are affected thereby.

The provision complained of, to the effect that certain persons enumerated may represent a corporation, association, or copartnership in signing such petition or any other petition or protest provided for in this act, does not preclude any interested party from protesting at such hearing. It is a permissive provision authorizing certain persons to represent interested parties but by no means excluding any authorized person from so representing them.

[5] 5. The fact that the act provides that the lands shall be assessed on a rate per acre basis is not repugnant to any provision of the Constitution of New Mexico or of the United States. This has been so held

by innumerable decisions of state and federal courts, some of which are quoted by this court in City of Roswell v. Bateman, 20 N. M. 77, 146 P. 950, L. R..A. 1917D, 365, Ann. Cas. 1918D, 426, in upholding the "front foot rule" of assessment. The Legislature may create taxing districts and meet the expense of local improvements, and may fix the basis of taxation without encountering the Fourteenth Amendment unless its action is palpably arbitrary or a plain abuse.

"A tax is an enforced contribution for the payment of public expenses. It is laid by some rule of apportionment according to which the persons or property taxed share the public burden, and whether taxation operates upon all within their state, or upon those of a given class or locality, its essential nature is the same. The power of segregation for taxing purposes has every-day illustration in the experiences of local communities, the members of which, by reason of their membership, or the owners of property within the bounds of the political subdivision, are compelled to bear the burdens both of the successes and of the failures of local administration. When local improvements may be deemed to result in special benefits, a further classification may be made and special assessments imposed accordingly; but even in such case there is no requirement of the federal Constitution that for every payment there must be an qual benefit. The state in its discretion may lay such assessments in proportion to position, frontage, area, market value, or to benefits estimated by commissioners. * * * And as we have said, unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property, it cannot be maintained that the state has exceeded its taxing power." Houck v. Little River Drain_age Dist., 239 U. S. 265, 36 S. Ct. 61. 60 L. Ed. p. 274.

"* * * The front-foot rule by which the cost of an improvement is to be apportioned among the several properties in proportion to their frontage on the improvement, and without regard to the benefits conferred, has, by some authorities, been condemned as denying the equal protection of the laws. But the constitutionality of statutes and ordinances prescribing this rule has generally been upheld, and the controversy over its validity has now been settled by decisions of the United States Supreme Court sustaining its use. An apportionment of the cost in proportion to area, and regardless of benefits, has also been sustained as constitutional, but the boundaries of a municipal taxing district may be so located as to constitute a denial of the equal protection of the law." 12 C. J. § 892, p. 1156.

"The doctrine that special assessments cannot be made without regard to benefits, has been held not to preclude the Legislature from authorizing the levy of a drainage

assessment upon all the property of a drainage district at a uniform rate according to its assessed value or a tax according to acreage, and in New Jersey a recognized exception to the rule rests upon 'inveterate usage,' whereby the parties who are to be charged with the expense of the improvement must have the right of participating in the management of the enterprise. If such right be conferred, legislation authorizing assessments in proportion to the quantity of land, instead of according to benefits received, is valid." 19 C. J. p. 732.

"The courts are very generally agreed that the authority to require the property specially benefited to bear the expense of local improvements is a branch of the taxing power or included within it. * * * Whether the expense of making such improvement shall be paid out of the general treasury or be assessed upon the abutting or other property specially benefited, and, in the later mode, whether the assessment shall be upon all the property found to be benefited, or alone upon the abutters, according to frontage, or according to the area of their lots, is according to the present weight of authority considered to be a question of legislative expediency." Dillon on Municipal Corporations, vol. 2 (4th Ed.) § 752.

The California irrigation act provides for an ad valorem assessment, which is just as arbitrary as an assessment by area as provided by the New Mexico law. The United States Supreme Court, in Fallbrook Irrigation District v. Bradley, 17 S. Ct. 56, says:

"The fact that the statute provides for an ad valorem assessment of the land benefited, instead of an assessment in proportion to the actual benefits conferred by the improvement, to pay the cost of constructing the works, does not deprive the persons assessed of property without due process of law."

[6] 6. By section 4 of said act it is provided that. after considering the petition favorably, the board of county commissioners shall by further order, duly entered upon their records, call an election of the qualified electors of said district, to be held for the purpose of determining whether such district should be organized under the provisions of the act, and to submit the names of certain persons to be voted upon as directors. By section 5, among other things, it is provided:

"At said election and all elections held under the provisions of this act, all persons who are resident freeholders

and owners of land within such district, who are citizens of the United States over twenty-one years of age (except idiots, insane persons, convicted felons not restored to political rights and Indians not taxed), shall be qualified electors: Provided, that if any farm or tract of land in such district is owned by more than one person, only one person shall be permitted to vote at any election as the owner of such one farm or tract of land."

Section 1 article 7, of the Constitution of New Mexico, is as follows: .

"Every male citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons, persons convicted of a felonious or infamous crime unless restored to political rights, and Indians not taxed shall be qualified to vote at all elections for public officers."

It is necessary to construe the intent of the framers of the Constitution as to the meaning of "shall be qualified to vote at all elections for public officers." There is nothing in the Constitution of New Mexico, referring to irrigation districts, or, indeed, to any quasi municipal corporation, unless it could be said that section 13 of article 5, or section 3 of article 8, has such reference. They read as follows, respectively:

"All district, county, precinct and municipal officers, shall be residents of the political subdivisions for which they are elected or appointed."

"The property of the United States, the state and all counties, towns, cities and school districts, and other municipal corporations * * * shall be exempt from taxation."

If it could be said that it was the intent of the constitutional convention, by either of the sections just quoted, to include such corporations, and to hold that their officers are public officers in the sense of the Constitution, then section 5 of the act is unconstitutional, in that some persons qualified to vote under the terms of the Constitution may be excluded from that privilege.

Section 3 of article 8 of the state Constitution was construed by this court in State v. Board of Trustees of the Town of Las Vegas, 28 N. M. 237, 210 P. 101.

The question before the court was whether or not
the Las Vegas grant was subject to taxation or whether
or not it was a "municipal corporation" in the sense
of section 3 of article 8 of the Constitution, and, in
holding that it was not such a municipal corporation,
the court said:

"Our conclusion that such organizations as the appellant
are not included within the phrase 'other municipal cor-
poration' is strengthened by the fact that, at the time of
the adoption of the Constitution of this state there was in
force a complete system for the organization and regulation
of municipal corporations, defining them as bodies politic
and corporate, and granting to them privileges extended
to like corporations. The original act on this subject was
chapter 39, Laws 1884, which, with certain additions not
material to this opinion, is found as chapter 75, Code 1915.
Such municipal corporations were the ones known to, and
contemplated by, the makers of the Constitution, and the
phrase 'other municipal corporations' did not extend to
organizations like the appellant, nor to corporations nor
bodies, which by their nature were not bodies politic and
corporate, nor instrumentalities, nor agencies of the state
government."

By chapter 22 of the Code of 1915, entitled "Com-
munity Land Grants," the various public land grants
made by Spain or Mexico to certain communities and
towns in New Mexico were organized into municipal
corporations. Article 5 of said chapter provides for
the organization of the Las Vegas grant into a quasi
municipal corporation. The administration of the
grant is placed in the hands of a board of trustees.
It is provided that moneys in the hands or under the
control of, or which may be received by the board of
trustees, should be invested in certain high-grade
securities, the income from which it is provided shall
be apportioned among the schools within the grant.
Notwithstanding the public is the beneficiary of this
corporation, it is held, as stated, that it is not a
"municipal corporation" as contemplated by the
Constitution, although these enactments were originally
laws passed in 1903 before the Constitution was
adopted. This court there decided that—

"The phrase 'other municipal corporations' does not extend
to organizations like the appellant, nor to corporations nor

bodies, which by their nature were not bodies politic and corporate, nor instruméntalities, nor agencies of the state government,''

—and we add thereto that it does not apply to such public corporations as irrigation districts, organized for municipal purposes.

"Municipal elections are not comprehended within a general provision for the qualification of voters 'at all elections' for this phrase contemplates only such elections comprehended by the Constitution; that is, those for certain officers, state and county, created by that instrument and directed to be filled by election.

"Of course, the conclusion reached in such cases must always depend upon the terms used in the Constitution and notwithstanding the power of the Legislature to create municipal corporations, if that instrument prescribed the qualifications of voters 'in all elections not otherwise provided' or 'at all elections prescribed by law'; so that, in place of being applicable to constitutional elections only, its provisions are especially applicable to all elections authorized by law. It is clear that the Legislature can neither add to nor detract from the qualifications of voters so prescribed." 9 R. C. L., title "Elections," § 42.

If it may be said that the constitutional reference to ''public officers'' included those of ''municipal corporations,'' which we do not decide, still this would not include irrigation districts which are not, strictly speaking, municipal corporations, but only public corporations for municipal purposes. Turlock Irr. District v. White, 186 Cal. 183, 198 P. 1060, 17 A. L. R. 72.

By the Constitution of Illinois, at the time of the decision of the case of Plummer v. Yost, 144 Ill. 68, 33 N. E. 191, 19 L. R. A. 110, the right to vote at elections was limited to male citizens of certain qualifications. An act of the Legislature was passed permitting women to vote at school elections. The provision of the Illinois Constitution is as follows:

"Every person having resided in this state one year, in the county ninety days, and in the election district thirty days next preceding any election therein, * * * or who shall be a male citizen of the United States, above the age of twenty-one years, shall be entitled to vote at such election." Const. art 7, § 1.

In holding that women had a right to vote as provided by law in school matters, the Supreme Court of Illinois stated that the Constitution makes it the duty of the general assembly to provide for a thorough and efficient system of free schools, and only provided for the election of a county school superintendent. The court then said:

"The General Assembly having complete control of the subject, had, of course, the power to provide for the choice of these officers by popular vote, but such an election is not necessarily a proceeding identical with the elections provided for by the Constitution; nor is it necessary that the qualifications of those voting for school officers should be the same as those for electors as defined by the Constitution." Plummer vs. Yost 144 Ill. 68, 33 N. E. 191.

To the same effect is Belles v. Burr, 76 Mich. 1, 43 N. W. 24, in which the Supreme Court of Michigan said:

"While it must be conceded that no person can vote for the election of any officer mentioned in the Constitution unless he possesses the qualifications of an elector prescribed in that instrument, it does not follow that none but such electors can vote for officers which the Legislature has a right to provide for, to carry out the educational purposes declared in that instrument."

To the same effect is Wheeler v. Brady, 15 Kan. 26, in which the Supreme Court of Kansas said:

"There is no school district election or meeting provided for in the Constitution; there is no provision as to how school district officers shall be elected, appointed or chosen; and we suppose that no one will claim that they are, by the terms of the Constitution, to be elected at either of the elections provided for in the Constitution; hence it would seem that the Legislature would have full and complete power in the matter; that the Legislature might provide for the election or appointment of school district officers as it should choose, when it should choose, in the manner it should choose, and by whom it should choose."

Also see State v. Cones. 15 Neb. 444, 19 N. W. 682.

If such constitutional provisions do not relate to school districts unless specifically mentioned, or unless made definite by some expression in the Constitution, it certainly should not apply to quasi municipal cor-

porations in which the general public are not primarily interested.

It is said in the case of Re Bonds of the Madera Irrigation District, 92 Cal. 296, 28 P. 272, 14 L. R. A. 755, 27 Am. St. Rep. 106:

"The Constitution makes provision in various places for municipal corporations, other than cities and towns. Article II, §§ 9, 10, 12, 16. In each of these sections provision is made with reference to the government or officers of 'the county, city, town, or other public or municipal corporations,' thus clearly indicating that there may be municipal corporations other than those of a town or city, and consequently that the provisions with reference to the incorporation of cities and towns found in section 6 of the same article are not controlling in the organization of other municipal corporations."

It was held in that case that the officers of such municipal corporations were public officers in a constitutional sense; but no such provisions appear in the Constitution of New Mexico. Accordingly, we hold that the act in question does no violence to the state Constitution.

[7] 7. Section 15 of said act provides as follows:

"If a majority of the qualified electors who are freeholders within said district have voted 'Bonds Yes,' the board of directors shall immediately cause bonds to be issued in amounts and payable in series as follows:"

It is contended that under this provision the majority of all the electors of the district, whether voting or not, is required to carry an affirmative proposition. We think this contention is erroneous.

This question was settled by the territorial Supreme Court in Fabro v. Town of Gallup, 15 N. M. 108. In that case it was held that two-thirds of the qualified voters at a bond election on the question of the issuance of bonds mean two-thirds of those actually voting at the election. The territorial Supreme Court necessarily was bound by the decisions of the Supreme Court of the United States, following Carroll County v. Smith, 3 U. S. 556, 4 S. Ct. 539, 28 L. Ed. 517, but we have no doubt this court would arrive at the same conclusion.

"Ordinarily, the vote of voters who do not choose to participate in an election are not to be taken into consideration in declaring the result. If the law requires a question to be decided, or an officer to be elected by the votes of the majority of the voters in the county, this does not require that a majority of all the persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by a majority of the votes cast. And so, a constitutional provision requiring the assent of two-thirds of the qualified voters of the county at any election lawfully held for that purpose of a proposed issue of municipal bonds, means two-thirds of the vote of the qualified voters present and voting at such election favorably as determined by the final return of the result." 9 R. C. L. title "Elections," § 117.

In the Constitution of Mississipi is the following provision:

"The Legislature shall not authorize any county, city, or town, to become a stockholder in, or to lend its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city or town, at a special election, or regular election, to be held therein, shall assent thereto." Const. 1869, art. 12, § 14.

The Supreme Court of the United States, in construing this provision, said:

"The assent of two-thirds of the qualified voters of the county, at an election lawfully held for that purpose, to a proposed issue of municipal bonds, intended by that instrument, meant the vote of two-thirds of the qualified voters present and voting at such election in its favor, as determined by the official return of the result. The words 'qualified voters' as used in the Constitution, must be taken to mean not those qualified and entitled to vote, but those qualified and actually voting. In that connection a voter is one who votes, not one who, although qualified to vote, does not vote." Carroll County v. Smith, 111 U. S. 565, 4 S. Ct. 544, 28 L. Ed. p. 517.

[8] 8. It is contended that section 4 of chapter 41 requires separate and distinct orders by the board of county commissioners on each of the various matters therein set out, and that one order is not a substantial compliance with said provision.

There is nothing in this record to show what orders were made by the board of county commissioners under section 4 complained of; but, if it refers to the order allowing the prayer of the petition and defining and establishing the boundaries and designating the name

of the proposed district, and the order calling the election, we can see no necessity for the board of county commissioners making separate orders, provided the orders made complied with the law, and it is not claimed that they did not.

[9] 9. It is claimed that the organization of the district was void because the polls were kept open at such election from 8 o'clock a. m. to 6 p. m., instead of from 9 a. m. to 6 p. m., as required by the general election laws of the state of New Mexico.

"The general rule is that statutory provisions as to the time of opening and closing polls are so very directory that the election is not vitiated by an irregularity in this respect which does not deprive a legal voter of his vote, or admit a disqualified person to vote, or which does not affect the result. Thus, an election will not be vitiated because the polls are kept open after the hours fixed for closing, in the absence of evidence that any votes were cast after that hour, or that sufficient votes were cast after that hour to change the result. But if the departure from the terms of the statute in regard to the time of opening and closing the polls is such that it must be deemed to have affected the result, the election must be held invalid; as for instance, where the delay in opening the polls prevented certain electors from voting, or where uncertainty exists as to the number of votes cast after the polls should have been closed." 20 C. J. title "Elections," § 209.

In this case the evidence shows that all of the votes were cast for the bonds, and there is nothing to show that there would have been any change in the result if the polls had not been opened until 9 o'clock, as provided by the state law; nor is it claimed that the polls were so opened for fraudulent or ulterior motives. We think, under the circumstances, that the election was valid.

[10] 10. Section 1 of said act provides:

"Whenever a majority of the resident freeholders owning more than one-half of the lands or the evidence of .title to said lands in any district in the state of New Mexico desire to provide for the irrigation of the same they may propose the organization of an irrigation district under the provisions of this act. * * *"

It appears that the outer boundaries of the district include some 20,000 acres of land, of which 10,627

acres were irrigable. The petition was signed by the owners of 7,600 acres of irrigable land within said outside boundaries, and, upon examination of the tabulated statement attached to the petition as to the ownership of lands, from which said irrigable lands are taken, it appears that more than 10,000 acres were owned by these particular landowners, and this includes, not only a majority of the land included within the outside boundaries, but also of the irrigable land. This would seem to be a sufficient compliance with the statute.

However, the lower court has found that the only lands included within the district, as shown by the initial petition and other organization proceedings, are approximately 10,627 acres of irrigable land. and that the malpais and non-irrigable lands within the outer boundaries are not a part of the district, and this court affirms the finding of the court below in this respect.

[11] 11. A portion of the descritpion of the outside boundaries of the district by metes and bounds is as follows:

"Thence in a southeasterly direction to a point approximately in the center of the dividing line between the southwest quarter of section 15 and the northwest quarter of section 22; thence south approximately one-quarter mile; thence in a southeasterly direction to the common section corner of sections 35, 36, 26, and 25; thence in an easterly direction approximately one and one-quarter miles; thence in a southeasterly direction to a point approximately in the center of the northeast quarter of section 31; thence in a southeasterly direction to a point in approximately the center of the dividing line between sections 32, T. 12 N., R. 10 W., and 5. T. 11 N., R. 10 W."

It is claimed that this description is too indefinite for the location of the boundaries of the district. Whether or not this description, standing alone, would be so indefinite, as contended, it is unnecessary to determine, for the map made part of the description shows definitely and positively that the word "approximately" was inadvertently made a part of the description, and that it was intended that the calls should be for the points exactly.

"Several objections are taken to the description contained in the petition. They are based upon the requirement of

the second section of the act, that such petition 'shall set forth and particularly describe the proposed boundaries of such districts.' It is probable that this provision requires a description by metes and bounds, for it is 'the boundaries' which are to be described, and not merely the district. But we think that a description by metes and bounds, which would be sufficient in an ordinary deed, is a compliance with the provision. 'The same construction that is given to grants is given to statutes which prescribe the boundaries of incorporated territories.' Iron Works v. Tolland, 9 Cush. 496. It has even been held that a more liberal rule should be applied. Hamilton v. McNeil, 13 Gratt. 394. But, at all events, a description by metes and bounds, which would be good in a deed, is sufficient in the petition." Central Irr. District v. De Lappe, 79 Cal. 355, 21 P. 827.

"The objections on the grounds that the proposed district was not definitely described in the petition for its organization, nor in the order calling the election, and that the latter varies from the former, seems to have been answered by this court in the case of Irrigation Dist. v. De Lappe, 79 Cal. 360, 21 P. 825, and cases last above cited. If the landmarks called for in the petition can be found on the ground, the description is sufficiently definite; and there is no evidence that such landmarks cannot be found. Nor does it appear that the description in the order calling the election varis from or is less definite than that in the petition." Cullen v. Glencora Water Co., 113 Cal. 517, 39 P. 772.

We hold that the description is sufficient.

[**12**] 12. The bond provided by law to be filed with the petition, conditioned that the signers will pay all costs incurred in the organization of the district, is statutory, except that it reads:

"Now, therefore, if the said principal does not pay to the county of Valencia all costs incurred in the organization of such district in case same is not effected, then this obligation to be null and void, otherwise to remain in full force and effect."

It is evident from reading the whole bond and from the law that this repugnant condition is simply a clerical error; that it was the intention of the parties to make a statutory bond; and that they are bound by its evident intention. 9 C. J. p. 41, § 67; 4 R. C. L. title "Bonds," § 17.

[**13**] 13. Section 4 of the act among other things provides:

"When such petition is presented * * * the commissioners shall then proceed to define the boundaries of said proposed district from such petition and .from such applications for the exclusion of lands therefrom and the inclusion of lands therein as may be made in accordance with the intent of this act, * * * and shall by final order duly entered upon their records define and establish the boundaries of such proposed district. * * * When the boundaries of any proposed district shall have been examined and defined as aforesaid the commissioners shall forthwith make an order allowing the prayer of said petition, defining and establishing the boundaries and designating the name of such proposed district."

The order contains the following:

"It is therefore ordered and declared that the territory embraced within the initial petition for the organization of the Bluewater-Toltec irrigation district, filed with the county clerk in this county, and as appears in the previous orders of this board, and in the call for said election, be and the same hereby is duly organized as an irrigation district under the name and style of the Bluewater-Toltec irrigation district."

There is no reason why the order should set out specifically within itself the boundaries of the district. This may be done by reference, as shown by the order entered.

[**14**] 14. The original petition for the organization of the district contains the following:

"8. It is further understood and agreed that we, the signers of this petition, in consideration of the formation of said irrigation district and of the construction of said irrigation system to completion, and the resulting permanency of the water supply for irrigation purposes, do hereby set over, transfer, grant, assign, release, and relinquish any and all claim whatsoever, and all water rights which we and each of us, may have acquired, or which we may have in and to the waters of Bluewater creek, and all other waters used to supply said irrigation system, and for ourselves, our heirs, executors, administrators, successors and assigns, we hereby agree to execute such instruments of grant and assignment to said irrigation district, when it is organized, as may be required for such purpose; provided, however, and it is hereby understood and agreed that this grant shall be null and void and of no effect, unless said irrigation district is organized to completion and said irrigation system adequate to irrigate our lands included therein is completed and put in operation, and water furnished for irrigation purposes on our said lands within a reasonable time from the organization of said district and, in case of failure, then all our water rights shall revert to us."

The district was organized for the purchase of other irrigation enterprises, as permitted by the law. The signers of the petition, by this agreement, transferred their water rights to the district conditional upon its organization within a reasonable time. There was a contract between an irrigation district and water right owners similar to the one complained of in this case mentioned in Cullen v. Glendora Water Co.. 113 Cal. 503, 39 Pac. 769. 45 P. 822, 1047, wherein the Glendora Water Company agreed to sell its water, water rights, reservoirs, etc., to the irrigation district, the same to be void unless the district was organized within 90 days. While the validity of this contract was not directly before the court except upon the question of fraud, it was treated as a valid contract by the Supreme Court of California.

We see no reason why an absolute, binding agreement to sell the water rights of these individuals to a corporation yet to be organized, and that might not be organized, should be necessary. The fact that it was limited to a ''reasonable time'' would mean a reasonable time under all the circumstances. There is nothing to show that the district was not organized within a reasonable time, and, in fact, it appears to have been so organized, as certainly there was practically no delay in its organization.

[**15**] 15. Section 15 of the Irrigation Act of 1919 contains the following:

''For the purpose of constructing or purchasing or acquiring necessary reservoir sites, reservoirs, water rights, canals, ditches and works, including necessary drainage works, and acquiring necessary property and rights therefor, for the purpose of paying the first year's interest upon the bonds herein authorized, and otherwise carrying out the provisions of this act, the board of directors of any such district shall, as soon after such district has been organized as may be practicable, estimate and determine the amount of money necessary to be raised for such purposes, and shall forthwith call a special election, at which election shall be submitted to the electors of such district possessing the qualifications described by this act the question of whether or not the bonds of said district shall be issued in the amounts so determined.''

It was held by the Supreme Court of California in Cullen v. Glendora Water Co., 113 Cal. 503, 45 P. 822

(on rehearing), in construing a similar provision in the California law, that such irrigation district could not issue bonds, unless, prior to their being voted, the estimate of money required was based on some definite plan for the construction of the work or for the acquisition and distribution of the water supply for which the bonds were to be issued; that is, that such bonds could not be issued merely upon an estimate made without some sufficient data based upon an engineering plan.

The district court has found that such data and plan was before the board of directors at the time such estimate was made. There is substantial evidence to support the finding of the court, and under the decisions of this court the finding of the trial court will not be disturbed when supported by substantial evidence.

[**16**] 16. There is no merit in the contention that a special meeting of the board of directors held February 20, 1924, was void because not called by the president of the board or by two directors. It appears that all the members of the board of directors were present and attending the meeting, and that it was held for the disposition of business properly before the board. 7 R. C. L. p. 441.

[**17**] 17. Nor is there any merit to the contention that, because the returns of the election for the bond issue were canvassed by the board of county commissioners after they were canvassed by the directors of the district, the election was illegal. Section 15 of said act provides that said election must be held and the results determined and declared in all respects as nearly as possible in conformity with the provisions of said act governing the election of directors, and section 10 provides that such election shall be canvassed by the board of directors. It seems that the board of directors did canvass the returns and declared the result, and that thereafter the county commissioners also canvassed the returns and declared the result. We fail to see that this act on the part of the board

of county commissioners affected the result of the election in any manner or injured any person.

[18] 18. A confirmation suit, as provided for by section 50 et seq. of the act, being suit No. 2950 on the docket of the district court of Valencia county, entitled "In the Matter of T. J. McNeill,. W. A. Thigpin, and H. J. Haverkampf, Board of Directors of Bluewater-Toltec Irrigation District," was filed, and a decree was subsequently entered confirming the legal organization of the district. The notice of suit was published in three successive issues of a weekly paper, but 21 full days did not elapse between the first publication and the entry of the decree in the case, although it was after the last publication.

The provision for such publication is found in section 51 of the act, and is as follows:

"The court shall fix a time for the hearing of said petition and shall order the clerk of the court to give and publish a notice of the filing of such petition. The notice shall be published for three successive weeks in a newspaper published in the county where the office of the district is situated."

As stated by this court in Dewitz v. Joyce-Pruit Co., 20 N. M. 572, 151 P. 237, the courts are divided as to whether such statutes require a publication for 3 full weeks or simply 3 publications in 3 successive weeks. In that case we did not find it necessary to determine between the lines of authorities, as another provision of the statute under consideration showed the intention of the Legislature to mean three publications in successive weeks, but not 3 full weeks.

The laws of Connecticut provide, in divorce cases, for the court to give such notice to the defendant as shall be reasonable. It was ordered in a certain case that notice should be given by publication in a certain newspaper for 2 successive weeks before the term of court. The case was heard before the full 2 weeks expired after the first publication. The Supreme Court of Illinois, in construing the Connecticut statutes, said:

"The clerk's order required that notice should be given to the respondent of the pendency of the petition by publishing a true and attested copy of the order in a desig-

nated newspaper 'for two weeks successively before the
term of the court to which the same was made returnable.'
*   *   *   The order did not in terms, require the two full
weeks should intervene between the first publication of the
notice and the first day of the term of the court. The
words of the order were, 'For two weeks successively before
the term of the court.' The order is probably susceptible
of either of two constructions: the one demanding the
lapse of two full weeks, as above indicated, the other only
calling for publication once in each of two successive weeks,
provided such publications are both prior to the term of
the court. This latter was manifestly the construction
placed upon the order by the Connecticut court, since it
incorporated in its decree the following finding: 'This
court finds that said petition has been duly served on the
respondent,' and this construction is in consonance with
the rulings in this state. In Madden v. Cooper, 47 Ill. 359,
the notice was published three successive times in a weekly
newspaper, the first publication being on March 16. the
second on March 23, and the last on March 30, and it was
held that this was compliance with the statute which
required three weeks' notice in a newspaper. In Pearson v.
Bradley, 48 Ill. 250, the statute required notice 'to be
published for three, successive weeks, once in each week,
in a newspaper,' and it was held that it was not intended
to require notice of sale to be published for three full
weeks, from the first publication to the date of sale, but
simply to secure three successive weekly publications of
such notice." Knowlton v. Knowlton, 155 Ill. 158, 39
N. E. 595.

The laws of Nebraska (Comp. St. 1887, c. 23, § 140)
require that notice of the probate of a will shall be
published in a newspaper directed by the judge "three
weeks successively, previous to the time appointed, and
no will shall be proved until notice shall be given as
herein provided."

The Supreme Court of Nebraska said:

"The words. 'three weeks successively' evidently mean a
publication once each week for three successive weeks—in
other words, three weekly publications—and the last publi-
cation need not necessarily be twenty-one days from the
date of the first." Alexander v. Alexander, 26 Neb. 68,
41 N. W. 1066.

The lien law of Colorado requires:

"The plaintiff shall cause a notice to be published at
least once a week for three consecutive weeks in some
newspaper published in the county." Laws 1872, p. 152, § 9.

In construing this law. the Supreme Court of Colo-
rado said:

"Besides these cases which are cited as sustaining the construction claimed by appellants, there are three cases, which we have not been able to consult, decided by some of the district courts of Pennsylvania, cited as sustaining the same view, by Mr. Freeman, in his work on Executions, wherein he states rather broadly, and with less than his usual care, we think: 'A majority of the cases upon this subject. * * * shows that the statutes requiring notice for three weeks cannot be satisfied by a publication for less than twenty-one days.' On the contrary a different construction is put upon such statute by the highest courts of the states of Illinois, New York, Massachusetts, and Maine. [The court here cites a number of authorities from the states mentioned.]"

The court concludes:

"That the present statute omits to distinctly express that the first publication shall be a given number of days before the time named, tends to strengthen the conviction that a different meaning was intended. * : * That the mode of publication pursued in this case was within the meaning of the statute, we think is supported by reason and authority." Decker v. Myles, 4 Colo. 558.

We hold that the publication was sufficient.

[**19**] 19. The act in question makes no provision for a notice to landowners and hearing upon the apportionment and levy of the assessment against the lands benefited, for which reason it is contended that the laying of any assessment upon such land would be null and void, and that it would violate the due process of law provision of the federal and state Constitutions. The California law (Wright Act) provides that the necessary funds for paying the interest and retiring the bonds, etc., shall be obtained from an ad valorem assessment, and the Supreme Court of the United States, in construing this act (Fallbrook Irr. District et al. v. Bradley, supra), held that the property owners were entitled to notice and hearing in determining the apportionment of this tax, as the amount to be taxed against particular property would depend upon its value. The Legislature of New Mexico fixes the apportionment on a pro rata basis according to area. The provision is as follows:

Section 20. "It shall be the duty of the county commissioners of the counties in which is located the office of any irrigation district, immediately upon receipt of the said certified list of the land in said distrct subject to tax

Davy v. McNeill et al., 31 N. M. 7

hereunder, and upon the receipt of the certificate of the said board of directors certifying the total amount of money required to be raised as herein provided, to fix the rate per acre of levy necessary to provide said amount of money and to fix the rate per acre necessary to provide the amount of money required to pay the interest and principal of the bonds of said district as the same shall become due; * * * and to certify said respective levies to the county commissioners of each other county embracing any portion of said district."

It will not avail the owner of lands to have a hearing upon the apportionment and the levy of the assessment, for the very good reason that the Legislature has fixed such apportionment at a sufficient rate per acre, spread equally over the land in the irrigation district, to produce the amount necessary to pay the interest and the principal of the bonds, and no hearing would give any advantage to a landowner. That the Legislature is authorized to determine the apportionment by the area, front foot, or other equitable rule, is no longer open to question in this state. City of Roswell v. Bateman, 20 N. M. 77, 146 P. 950, L. R. A. 1917D, 365, Ann. Cas. 1918D, 426. And, where the Legislature itself, without submission to a board or tribunal, determines the manner of apportionment of the tax or assessment, the lack of notice to the landowner will not deprive him of his property without due process of law. It is true the Legislature has not determined the exact amount that will be apportioned against any tract of land, but such apportionment will be merely a mathematical calculation, and is in effect an apportionment by the Legislature itself.

"* * * If the mere measurement of the front of the lots abutting upon the improved street, and the mathematical calculation of the plaintiff's portion of the tax, required that notice be given to plaintiff of the proceedings in the matter of the assessment and levy, all that such notice could avail would be to prevent or correct mistakes in the amount chargeable to plaintiff's property. We do not think that a notice to the owner, in a case like this, should be held essential to the validity of the assessment and levy. It appears to have been quite uniformly held that where the only act necessary to ascertain the amount of the assessment upon the property is a plain mathematical calculation, and no discretion is left to the city council, no notice is necessary." Amery v. City of Keokuk, 72 Iowa, 701. 30 N. W. 780.

In a case where an assessment for the cost of a sewer was taxed against abutting property, according to area, and the act provided no notice or hearing in the apportionment of the tax, the Circuit Court of the District of Colorado, in Gillette v. City of Denver, 21 F. 822, said:

"Now, in this case, the tax levied by the area; no question of value, no matter of judgment—a mere mathematical calculation; and of what earthly profit could it be to a taxpayer to · have notice of that calculation? He can make it himself. He cannot correct by testimony the judgment of any body; it is as exact and settled as anything can be."

The same conclusion was reached by the Supreme Court of Delaware.

"The question has been repeatedly discussed, however, when the second method has been adopted; that is, when the Legislature, as in this case, itself fixes upon some definite standard, which is applied to estates by a measurement of length or quantity or by a value independently fixed. In such cases it is argued that nothing remains to be done to fix upon each individual the amount of his assessment except to make a mathematical calculation, and as a hearing, or an opportunity for a hearing, would therefore be useless and futile, the maxim, 'Cessante ratione, cessat et ipsa lex,' would apply. ⁑ ⁑ ⁑ In this case the reason for the requirement of notice is well illustrated, and also the limitation of the requirement to cases in which notice could be of some conceivable use—to cases where, if a hearing were had, there would be something to hear and determine. The familiar illustrations, taken from species of taxation with which we are all familiar, make clear the analogies which have guided Legislatures in apportioning assessments for local improvements directly by mathematical calculation, and without opportunity given to property owners for a hearing as to the amount of each individual's assessment." English v. Mayor, etc., of City of Wilmington, 2 Marvel (Del.) 63, 90, 37 A. 158, at pages 162 and 163.

"It was also said that the class of lands to be assessed for the purpose may be either determined by the Legislature itself, by defining a territorial district, or by other designation; or it may be left by the Legislature to the determination of commissioners, and be made to consist of such lands, and such only, as the commissioners shall decide to be benefited; that the rule of apportionment among the parcels of land benefited also rests within the discretion of the Legislature, and may be directed to be in proportion to the position, the frontage, the area or the market value of the lands, or in porportion to the benefits as estimated by commissioners." French v. Barber Asphalt Co., 181 U. S. 324, 21 S. Ct. 625, 45 L. Ed. 879.

In the case of Wagner v. Leser, 239 U. S. 207, 36 S. Ct. 66, 60 L. Ed. 230, the Supreme Court of the United States, in passing upon the constitutionality of an act of the Legislature of the state of Maryland, providing for a tax of a certain sum for each front foot of abutting property for paving in the city of Baltimore, said:

"It is further urged, and much stress seems to be laid upon this point, that the complainant and others similarly situated were given no opportunity to be heard as to the amount of benefits conferred upon them, and the proper adjustment of the taxes among property owners. But this question, like the other, is foreclosed by the former decisions of this court. This assessment, and the classification of the property to be improved, were fixed and designated by legislative act. It was declared that the property which had been improved by paving theretofore should, according to the width of the paving in front of the respective properties, be assessed at a certain sum per foot front. We think such a tax, when levied by the Legislature, did not require notice and a hearing as to the amount and extent of benefits conferred in order to render the legislative action due process of law within the meaning of the federal Constitution.

"* * * Taking the decisions in this court together, we think that it results that the Legislature of a state may determine the amount to be assessed for a given improvement, and designate the lands and property benefited thereby, upon which the assessment is to be made, without first giving an opportunity to the owners of the property to be assessed to be heard upon the amount of the assessment or the extent of the benefit conferred.

"We do not understand this to mean that there may not be cases of such flagrant abuse of legislative power as would warrant the intervention of a court of equity to protect the constitutional rights of landowners, because of arbitrary and wholly unwarranted legislative action."

The following authority also sustains these views:

"It is not necessary to give notice or provide a hearing as to facts which the Legislature may and does determine; or as to which it may authorize the public corporation to make a legislative determination.

"A notice and hearing are not necessary in case of legislative determination of the proper rule of apportionment of the assessment upon the property assessed. If the Legislature determine that the assessments should be apportioned according to area, or according to frontage, or at a certain rate per foot, notice and hearing are unnecessary. If a notice could not have been of any avail to the owner of the property assessed, the want of such

notice cannot operate to invalidate the assessment. If a valid legislative determination has settled certain facts and the amount of the assessment is to be determined from the facts already properly ascertained by mere mathematical computation, notice and hearing are not necessary as to such computation, since the rights of the parties could not in such case be affected by evidence adduced at such hearing. If an assessment is to be apportioned according to the number of feet each lot has fronting or abutting on the street, for the improvement of which the assessment is levied, it has been held that such notice is unnecessary, since the apportionment of the entire cost according to frontage is a mere mathematical computation." 2 Paige & Jones on Taxation by Assessment, § 728, pp. 1261, 1262, 1264.

The Legislature was authorized, in its discretion, to determine the manner of apportionment, and, having so determined it according to area, the landowners are bound by this exercise of such authority; and the fact that the act does not provide for a notice and hearing on this matter of apportionment of the assessment does not deprive the landowners of their property without due process of law.

No error appearing in the record, the judgment of the district court will be affirmed, and it is so ordered.

BICKLEY and WATSON, JJ. We concur in holding the act constitutional. We have not been able to satisfy ourselves, however, that the legislative policy of apportioning the cost of the improvement per acre of included land dispensed with the constitutional necessity of notice to the landowner, and an opportunity to be heard as to whether the cost to the landowner will be or is in excess of the special benefit to his land. We think that such notice and opportunity for hearing are afforded by the statute. We are of the opinion that the decision of this court in City of Roswell v. Bateman, 20 N. M. 77, 146 P. 950, L. R. A. 1917D, 365, Ann. Cas. 1918D, 426, declares principles which have application to this case

It is complained by the appellant in this case that under the irrigation district act the property owners are not given opportunity, after notice, for hearing on the questions of benefits received, and that no provision is made for a hearing upon the levy of assess-

ments, and that, therefore, the act constitutes the taking of property without due process of law.

In Roswell v. Bateman, supra, we decided:

"Where an assessment levied for a street improvement can only be enforced by the filing of a notice of lien, and foreclosing the same in the same manner that mortgages on real estate are foreclosed, and as such foreclosure can only be had upon notice to the property owner, there is no taking of property without due process of law, although neither the statute nor ordinance adopted in pursuance thereof makes provision for notice to the owner of property of the levying of assessments for street improvements."

So much of section 22 of the act in question as amended as is material is as follows:

"The revenue laws of this state for the assessment, levying and collection of taxes on real estate for county purposes, except as herein modified, shall be applicable for the purposes of this act, including the enforcement of penalties and forfeitures for delinquent taxes."

Section 20 of the act declares that "all taxes levied under this act are special taxes." The difference between general and special taxes is marked.

"There is a marked difference between general taxation and special assessments for local objects, and the word 'tax' may be used in a contract or statute so as not to embrace within its meaning local or special taxes, although both kinds of taxation derive their authority from the general taxing power." Newby v. Platte County, 25 Mo. 258, 269; Farrar v. City of St. Louis, 80 Mo. 379, 389.

"Special taxation means the same as special assessment, and in general is used to indicate impositions of assessments made on property in cities to pay for city improvements according to the extent of the value of the property by reason of the improvement. Special taxation differs from general taxation in this, that special taxation can only be imposed to the extent of the special benefits received, while the benefits which the taxpayer receives in return for general taxation are simply the enforcement of the laws, protection to life and property, and such other benefits as he shares with the public at large. The principle, however, which underlies special taxation is that the value of the property is enhanced to an amount at least equal to the assessment. City of Beatrice v. Brethern Church, 59 N. W. 932, 934, 41 Neb. 348." 7 Words and Phrases, 6592.

That these observations are pertinent will be seen from the irrigation district act which so frequently

refers to the lands to be benefited by the improvement and the importance given to the element that only lands benefited shall be embraced within the district. See, also, State ex rel. Johnson vs. Chicago, etc., Co., 195 Mo. 228, 241, 93 S. W. 784-787 (113 Am. St. Rep. 661), wherein the court said:

"The term 'special taxes,' as applied to the charging of the cost of the improvement of city streets against abutting property, is not technically correct. Such charges are special benefits and not taxes in any sense of the word. If they were taxes, they could not, generally, be enforced, because the amount would make the total tax exceed the limitation prescribed by the Constitution."

Page & Jones on Taxation by Special Assessment, par. 50 defines "special tax" as follows:

"The term 'special tax' is one which is used with several different meanings. In many cases it is used as a synonym of the local assessment."

These definitions are sufficient to indicate that, although our statute used the expression "special taxes" to describe the funds to be raised to defray the costs of the improvement, they are in the nature of assessments on the theory of benefits to accrue to the property to be improved. General taxes which are collected under the revenue laws of the state are levied upon a different basis.

Cooley on Taxation (4th Ed.) defines taxes as follows:

"While in a general sense the term 'taxes' includes every burden that may be lawfully laid upon citizens by virtue of the taxing power, yet all burdens imposed in the exercise of the power are not taxes.

"For instance, special assessments, although an exercise of the taxing power, are not taxes, so-called taxes are often not taxes within the legal definition of the term. Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and for all public needs."

An examination of the taxation code contained in chapter 133, Laws 1921, discloses that the only method existing at the time this cause of action was commenced, for the foreclosure of the lien of taxes levied

upon real estate, is by suit in the district court, commenced by filing a complaint therein. In such action the lien on the real estate charged with the taxes may be foreclosed. Summons to the defendant, or persons having property assessed, or any right or title or interest in the real estate, is to be served by publication. It is suggested, however, that this provision of the irrigation district act by reference does not provide "due process of law," because section 431 of the general revenue law limits the defenses which may be made in an action to collect taxes in an action in the district court. Bearing in mind the difference in the nature of the general taxes and the special taxes provided by the irrigation district act, and considering section 22 thereof, and the apparent modification of the general revenue law in the matter of assessment and otherwise, we construe section 22 of the irrigation district act to mean that the revenue laws of this state for the assessment, levying, and collection of taxes on real estate for county purposes are applicable for the purposes of this act, except where the provisions of the general revenue act may be inapplicable. It is apparent that the provisions of the general revenue law which are adopted, except as modified by the irrigation act, would be inapplicable in its workings in a number of respects for the purposes of the irrigation district act. We think that section 431 of the revenue act, with respect to the defenses which may be made in a suit to collect general taxes, is inapplicable to a suit to collect special taxes and enforce the lien thereof under the irrigation district act; and we think that what was said in Kentucky Tax Cases, 115 U S. 336,. 6 S. Ct. 57, 29 L. Ed. 414, is applicable to the situation which here presents itself.

The court, after approving the rules as laid down in Davidson v. New Orleans, 96 U. S. 97, 24 L. Ed. 616, and Hagar v. Reclamation District No. 108, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569, which are cited in City of Roswell v. Bateman, supra, said:

"In that case, the statute of California, which conferred the jurisdiction, authorized any defense, going either to

the validity or to the amount of the tax assessed, to be pleaded. What inquiries may be permitted in such cases, of course, is a matter that depends upon the particular provisions of the law of the jurisdiction. In the absence of such provisions, and as a principle of general jurisprudence, it is safe to say, that any defense is admissible which establishes the illegality of the proceedings resulting in the alleged assessment, whether because it is in violation of the local law which is relied on as conferring the authority upon which it is based, or because it constitutes a denial of a right secured to the party complaining by the Constitution of the United States."

Being convinced, therefore, that the provisions for a suit to collect taxes under the general revenue law is applicable to the purposes of the irrigation district act with respect to collection of the special taxes provided for therein, and the enforcement of the lien thereof, and that the defenses provided in the general revenue act would not be exclusive in such an action to collect the special taxes which may be imposed by the irrigation district act, we conclude that the appellant and others similarly situated are given an opportunity, after notice, for hearing by way of defense of his grievances before his property could be irrevocably charged with the lien of the special taxes, or such lien foreclosed.

For these reasons and others we concur in the decision..