Argued February 15, reversed and suit dismissed February 27, 1917.

## WILSON *v.* WASCO COUNTY.

(163 Pac. 317.)

**Counties—Bonds—Elections—Validity—Certificate of County Court.**

1. Under Laws of 1913, page 174, providing that the order of the County Court shall be conclusive as to regularity of proceedings for the issuance of road bonds if a majority of voters at any general or special election shall have voted in favor of issuing such bonds, the authority of the County Court depends upon whether a majority of the voters actually voted for the measure, and the order of the County Court does not foreclose an investigation into the election.

**Counties—Bonds—Election—Count of Votes—Majority.**

2. The majority of those voters voting on the issuance of bonds for building and maintaining county highways, and not the majority of all voters voting at the election, determines whether such bonds shall be issued under Laws of 1913, page 170.

From Wasco: WILLIAM L. BRADSHAW, Judge.

An injunction suit by O. E. Wilson against the county of Wasco, F. S. Gunning, County Judge, F. C. Clausen, R. D. Butler, county commissioners, constituting the County Court of Wasco County, Oregon, L. B. Fox, county clerk of Wasco County, in which plaintiff obtained a decree and defendants appeal.

Department 2. Statement by MR. CHIEF JUSTICE McBRIDE.

This is a suit to enjoin the defendants from issuing the bonds of Wasco County, Oregon, under the provisions of Chapter 103, Laws of 1913, in the sum of $260,000, for the purpose of building and maintaining permanent highways. The amended complaint alleges that the plaintiff is a citizen, resident and taxpayer of Wasco County, and a freeholder therein, and states the official capacity of the defendants other than the county; that on the eighteenth day of September, 1916, the County Court of Wasco County, Oregon, by resolution, submitted to the electors of said county, at the general election on November 7, 1916, the question of issuing bonds for the purpose of raising money to the amount of $260,000, to be used in the construction and maintenance of public roads, and ordered and directed the county clerk to cause the proper notices of election to be issued and the question to be placed upon the official ballot; that the notices were regularly posted, and that at said election there were cast upon said question of said bonding 3,921 votes, of which 2,011 were "Yes," and 1,910 were "No," the majority for said bonds being 101; that on November 25, 1916, the County Court made and entered an order to that effect, which order further stated:

"That a majority of voters voting at said election voted in favor of the issuance of said bonds so submitted at said election, and that said bonds carried."

The complaint then avers that in truth and in fact there was a larger number of voters who voted at said election for certain officers than 4,021, to wit: For district attorney there were cast 4,351 votes; for sheriff, 4,285 votes; for county treasurer, 4,206 votes; for county assessor, 4,213 votes; upon the so-called brewers' amendment, 4,178 votes; and on the prohibition law, 4,135 votes. The complaint contains no allegation that there were any irregularities in connection with the submission of the proposition to the voters, but raises the single question as to whether the measure received a sufficient number of votes, or, in other words, as to whether it carried or lost. The only question presented is as to the construction of Section 11, Chapter 103, Laws of 1913. The contention is made by the plaintiff that under this section in determining whether the matter of bonding the county has been carried or lost the votes cast upon that particular question are not conclusive, but that the total number of voters voting at said election must be determined in some other way; and that unless a majority of all voters voting at said election upon this or any other matter are in favor of the bonds the proposition is lost. There was a general demurrer to the complaint, which was overruled, and the defendants electing to stand upon the demurrer there was a decree setting aside all orders of the County Court, declaring the proceedings for the issuance of said bonds void, and enjoining the issuance thereof, from which decree defendants appeal.

REVERSED AND SUIT DISMISSED.

For appellants there was a brief with oral arguments by *Mr. Francis V. Galloway,* District Attorney, and *Mr. William H. Wilson.*

For respondents there was a brief over the name of *Messrs. Wood, Montague, Hunt & Cookingham,* with an oral argument by *Mr. Prescott W. Cookingham.*

Opinion by MR. CHIEF JUSTICE McBRIDE.

As will be seen by the foregoing statement there was a majority of all the votes cast either .way upon the proposed measure in favor of-the issuance of the proposed bonds, but less than a majority if those voting for county officers at the same election, but not voting on the proposed measure, are to be added to the minority and counted as though they had voted negatively. Section 2 of Chapter 103, Laws of 1913, provides that upon a petition signed by a number of registered voters of any county equal to one fourth of the highest number of votes cast for any one person for supreme judge at the preceding election, the County Court shall call a special election and submit the question of issuing road bonds to the legal voters of such county. Sections 3 and 4 prescribe among other matters the form and requisites of such petition and the order to be made thereon. Section 5 provides that upon a like petition of a number of voters equal to one twentieth of the highest number of votes cast for any candidate for supreme judge, the court is authorized, but not required, to submit the question of issuing bonds in the same manner as provided in Section 4. Section 6 requires twenty days notice of such special election to be given by posting printed notices in the following form:

"Notice is hereby given that on the —— day of ——, 191—, a special election will be held in —— to determine whether the County Court shall issue bonds of said county to provide for permanent road construction to the amount of —— dollars, to mature in —— years, no more than —— dollars to be issued in any one year, and to bear interest at the rate of —— per cent per annum; and the funds so raised shall be expended in building permanent roads, described as follows, to wit: $—— shall be expended on the road from —— to —— and $—— shall be expended on the road from —— to ——, etc. County clerk for —— county."

Section 7 requires the County Court to have printed for use at such special election the same number of ballots and sample ballots as would be required for a general election. Section 9 provides that upon petition of a number of voters equal to one tenth of the greatest number of votes in favor of any person for supreme judge at the preceding election, praying that the question of issuing bonds shall be submitted to the voters at a general election, the County Court shall take the same action as provided in Section 4, except that instead of calling a special election the question shall be submitted at the next general election. Section 10 is as follows:

"The County Court of its own motion may submit the question of issuing bonds for the purpose mentioned in section one of this act at any election. This may be done by an order of the County Court which shall be entered in the journal at least 40 days next preceding any general election, which order shall set out the amount of bonds proposed to be issued, the length of time they shall run, and the maximum rate of interest they shall bear. After having entered such order, the court shall proceed to submit the question to the voters of the county in the same manner and with like effect as upon the petition provided for in this act."

Section 11 among other matters provides:

"If at any general or special election as provided for in this act a majority of the voters voting at such an election shall vote in favor of issuing such bonds, the County Court shall enter an order in its journal declaring that fact, and that order shall be absolutely conclusive as to the regularity of all the proceedings in reference to the matter."

In the consideration of this question it may be well to observe that the provision last quoted making the order of the County Court absolutely conclusive as to the regularity of all the proceedings does not extend to its determination as to the votes cast; its jurisdiction to declare the result and the conclusive nature of such declaration being derived from the fact that a "majority of the voters voting at such election" had voted in favor of the bond issue. The authority of the County Court to conclusively determine the regularity of the proceedings depended upon whether a majority of the voters had actually voted for the measure.

1. The court could not give itself jurisdiction by merely reciting that it had it. Such being the case, an investigation into the merits of the controversy is not foreclosed by any order made by the County Court. Upon the main question presented the authorities are in hopeless conflict. So great an authority as Judge COOLEY has declared that it is impossible to harmonize the conflicting decisions, and contented himself with citing them without expressing any opinion as to their relative weight: Cooley, Const. Lim. (6 ed.), 747, note. The following cases hold but under varying statutes where the law requires a "majority of the voters voting at such an election," or where language equivalent to that quoted is used, a majority of those voting on the question is insufficient to enact the measure: *State ex*

*rel.* v. *Brooks,* 17 Wyo. 344 (99 Pac. 874, 22 L. R. A.
(N. S.) 478); *Knight* v. *Shelton* (C. C.), 134 Fed. 423;
*State ex rel.* v. *Wilson,* 129 Mo. App. 242 (108 S. W.
128); *Bryan* v. *City of Lincoln,* 50 Neb. 620 (70 N. W.
252, 35 L. R. A. 752); *Stebbins* v. *Judge of Superior
Court,* 108 Mich. 693 (66 N. W. 594); *Lodoen* v. *City
Council, etc.,* 118 Minn. 371 (136 N. W. 1031); *Chestnut-
wood* v. *Hood,* 68 Ill. 132; *State ex rel.* v. *Benton,* 29 Neb.
460 (45 N. W. 794); *Santa Rosa* v. *Bower,* 142 Cal. 299
(75 Pac. 829). The above citations by no means exhaust
the authorities holding the view above indicated. On
the other hand, quite as many authorities can be cited
holding the opposite doctrine. In *State ex rel.* v.
*Grace,* 20 Or. 154 (25 Pac. 382), a statute providing for
the location of the county seat of Harney County con-
tained the provision that at the next election the ques-
tion of the permanent location of the county seat (tem-
porarily located at Harney) should be submitted to the
legal voters of the county, and that the place receiving
a majority of all the votes cast should be the county
seat, etc. The question was submitted as directed,
and, while the town of Burns received a majority of
the votes cast upon that subject, it did not receive a
majority of all the votes cast for candidates at the
election. This court held that the words "a majority
of all the votes cast" meant a majority of all the votes
cast upon the question of the location of the county
seat. This holding is cited and approved in *Philo-
math College* v. *Wyatt,* 27 Or. 390, 453 (37 Pac. 1022,
26 L. R. A. 68, and note), the court adding:

"There appears to be a distinction made as to
whether the vote is provided for in the constitution or
only by statute. If the former, then the whole number
voting at the election are to be counted, whether they
vote upon the particular matter in question or not;
but, on the other hand, it appears to be equally well

settled that when a vote is taken under a statutory enactment, without a constitutional provision, the consent of those not voting will be presumed.''

While neither of the cases above cited are exactly parallel to the case at bar, and, while a slight difference exists between the language of the statute there considered and that now under consideration, it is not believed that such differences are so radical as to permit any distinction to be made in the principle involved; and if we were to rely upon precedent only, we might well stop here and reverse the decree rendered in this case, but the precedent is supported by authority as well as by other considerations which we shall presently mention. In *Fox* v. *City of Seattle,* 43 Wash. 74 (86 Pac. 379, 117 Am. St. Rep. 1037), the question arose upon the validity of an election held to authorize an indebtedness beyond a certain limit. The Constitution of the state (Article VIII, Section 6) provided:

''No county, city, town, school district, or othei municipal corporation, shall for any purpose become indebted in any manner to an amount exceeding one and one half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three fifths of the voters therein voting at an election to be held for that purpose.''

The charter of the city of Seattle contained the following provision:

''When loans shall be created exceeding one and a half percentum of the taxable property in the city, and bonds therefor issued by the city under this charter, the city council in authorizing and providing for the same shall direct the times and manner of payment and rates of interest, but no such bonds shall be issued except as provided by law, nor unless the proposition

for creating such indebtedness shall have been previously submitted to the electors of the city at a regular, general, or special election, of which thirty days' notice shall have been published in the city official newspaper, and such proposition shall have then received the assent of three fifths of the voters voting at such election.''

It will be seen from these excerpts that the case is in all substantial respects parallel to the case at bar. The question of incurring an excess indebtedness was submitted at a general city election and received the assent of three fifths of the voters upon that question, but less than three fifths of the whole number of votes cast for city officers. In an elaborate opinion by Mr. Justice DUNBAR the court held that the true intent of the provision was to require the assent of three fifths of the voters who voted upon the particular question submitted. Every point urged by the plaintiff here was considered, and the opinion concludes with this quotation from *Strain* v. *Young,* 25 Wash. 578 (66 Pac. 64):

''If other voters, who had the opportunity to exercise the power of the ballot, declined to do so, they cannot now complain upon any principle of right or justice. Voters should be sufficiently interested in the public welfare to go to the polls at the time of an election and vote upon the propositions submitted. If they fail to do so, then, under our interpretation of the constitution, those who actually do the voting upon propositions submitted must determine them.''

To like effect is *State* v. *Blaisdell,* 18 N. D. 31 (119 N. W. 360), which was an election to determine the creation of a new county; the court saying:

''There is no more reason why the votes cast on the question of creating a new county should have any relation to the votes cast for Governor than the votes cast for presidential electors should have. Nor is

there any logical reason why the votes cast for Governor should have any relation to those cast on the creation of a new county.''

See also *Howland* v. *Board of Supervisors,* 109 Cal. 152 (41 Pac. 864); *Tinkel* v. *Griffin et al.,* 26 Mont. 426 (68 Pac. 859); *Montgomery County Fiscal Court* v. *Trimble,* 104 Ky. 629 (47 S. W. 773, 42 L. R. A. 738); *State* v. *Barnes,* 3 N. D. 319 (55 N. W. 883); *Gillispie* v. *Palmer,* 20 Wis. 544; *Smith* v. *Proctor,* 130 N. Y. 319. (29 N. E. 312, 14 L. R. A. 403). The cases herein cited do not exhaust the authorities holding either view of the subject, but they are sufficient to indicate in a general way the views the various courts have advanced. We are of the opinion that the reason and logic of the controversy are with those courts which hold that the majority of those electors who actually vote upon a measure is controlling. This is in accord with the general spirit of our institutions, wherein the will of the majority as expressed at the polls is supposed to govern. It is moreover indicated by the general features of the statute in question. Section 7 prescribes the form of ballot as follows:

''Shall there be issued bonds of —— county to the amount of —— dollars, due in —— years, with interest at —— per cent per annum to provide for permanent road construction? Yes ——. No. ——.''

The form prescribed indicates that persons objecting to the issuance of bonds are required to express that objection by voting no, and not by refusing to vote at all on the measure. There is no question but that if the measure had been submitted at a separate election, the vote which it received would have carried the measure, and it seems unreasonable to hold that a voter who goes to the polls and refuses to cast a negative vote can accomplish the same result by ignoring

the measure altogether. The election, although held on the same day as the general election, was special in character. It was not called or held in pursuance of those general statutes which provide for biennial elections for the purpose of choosing public officers, but was called by order of the County Court. Special election notices were posted separately from the notices of the regular election, and its only relation to the general election arises from the fact that the measure was placed, for the sake of economy and convenience, upon the general ballot; and that in accordance with Section 7 of the act the judges and clerks of the general election canvassed the returns and counted the votes. Called as it was for a special purpose by a special order and by a separate and special notice, we are of the opinion that it was a special election for the purpose of voting on the question of issuing bonds. This view of the case is supported by *Howland* v. *Board of Supervisors,* 109 Cal. 152 (41 Pac. 864), where the election was held under conditions similar to those in the case at bar, and where the statute provided:

"No county * * shall incur any indebtedness or liability in any manner, or for any purpose, exceeding in any year the income of revenue provided for it for such year, without the assent of two thirds of the qualified electors thereof voting at an election to be held for that purpose."

The court said:

"If there had been no general election held at the same time this bond election was held, there would be no question but that two thirds of the qualified electors of the county voting assented thereto, and the fact that the county, by its board of supervisors, embraced the privilege extended to it by the legislature by the act of 1891, and held the election upon the day and at

the same place as the general election, we think wholly immaterial. * * If additional argument were necessary to sustain a construction already plain, it may be suggested that the election held upon this day, as far as the bond question is concerned, was a special election. The election was called by proclamation of the board of supervisors of San Joaquin County, for a single, definite purpose, and, *ex necessitate,* was a special election,. and the votes cast for and against the issuance of bonds were all the votes cast at that election. As already suggested, the fact that the legislature granted the county the right to use the machinery of the state in conducting the election, if it so desired, and that it embraced the right granted,. in no way changes the aspect of the case."

In *Fox* v. *City of Seattle,* 43 Wash. 74 (86 Pac. 379, 117 Am. St. Rep. 1037), the court discussing the same subject says:

"It will be observed that the constitution requires propositions of this kind to be submitted to a vote at an election to be held for that purpose. This is, in effect, providing a special election for the submission of questions of this kind, and if all the requirements of a special election are met, as we understand they were met in this case, by giving proper notice, etc., the fact that for the sake of economy the election was held on the same day that a general city election was held, and that the same ballots were used, does not make it a general election, or take it out of the provision of the constitution above quoted, viz., that such proposition must be submitted at an election to be held for that purpose; but that the election on the special proposition being so held, is merely an incident not affecting in any manner its distinct purpose or character."

In *State* v. *Blaisdell,* 18 N. D. 31 (119 N. W. 360), the court says:

"In a strict legal sense, although the vote on a change in county boundaries is cast at a general election, it is the holding of a 'separate election,' but held

in connection with the general election for convenience, to save expense, and because of the numerous subjects then voted upon, a more complete expression of the preferences of the electors is obtained.''

2. We think it was not the intention of the legislature to depart from the rule observed from the foundation of our state government, that the majority as expressed by the votes cast at the polls should rule, and to substitute for this wholesome and immemorial practice the requirement that the ignorant or indifferent silence of a voter should weigh equally against the vote of the citizen who considers a measure and expresses his convictions by voting for or against it.

The decree of the Circuit Court is reversed and the suit is dismissed.      REVERSED AND SUIT DISMISSED.

MR. JUSTICE MOORE, MR. JUSTICE BEAN and MR. JUSTICE McCAMANT concur.