# Richmond

## FALLS CHURCH TAXPAYERS LEAGUE, ETC., ET AL. v. CITY OF FALLS CHURCH, ET AL.

June 11, 1962.

Record No. 5441.

Present, All the Justices.

*Douglas A. Clark* (*Louis Rabil,* on brief), for the plaintiffs in error.

*LaRue Van Meter,* for the defendants in error.

SNEAD, J., delivered the opinion of the court.

Pursuant to § 15-666.57, Code 1950, as amended, Falls Church Taxpayers League, an unincorporated association, and others filed an amended motion for judgment against the City of Falls Church and others. The motion averred that a special election held on November 8, 1960, which allegedly approved an ordinance adopted by the city council providing for the issuance of general obligation bonds by the city to finance capital improvement projects, was not a valid election because of certain irregularities in connection therewith. Plaintiffs sought to have the bonds declared invalid and to enjoin the city from issuing them. After hearing the evidence *ore tenus,* the trial court by its order of September 29, 1961, denied the relief requested, held that the bond election was valid, and that the election approved and validly authorized the issuance of $1,200,000 in bonds for the purposes stated in the ordinance. To this adverse decision, the plaintiffs sought an appeal under § 15-666.60, Code 1950, as amended, which we granted.

The litigants will be referred to at times as plaintiffs and defendants in accordance with the positions they occupied in the court below.

Section 7.06 of the charter of the City of Falls Church (c.323 Acts of Assembly, 1950,) provides in part:

"* * * Upon adoption by the council of a bond ordinance, the city clerk shall forthwith certify a copy of said ordinance to the Circuit or Corporation Court having jurisdiction or to the Judge

thereof, in vacation, who shall thereupon order a special election of the qualified voters of the city to be held by general law in such cases provided. If a majority of those voting therein at such election shall approve the ordinance, it shall take effect immediately, and if not, it shall be void; provided, however, that such majority shall include a majority of the qualified voters who are freeholders voting in such election. For the purpose of such election, the registered qualified voters of the city who are also freeholders in the city on the date of notice of such election shall be determined in the following manner: at least twenty days prior to such election the council shall ascertain and record on an official list the names of such registered qualified voters who are also freeholders in the city and shall publish forthwith such list by posting copies thereof in at least three public places in the city. On such posted copies, notice shall be given of the time and place of a meeting of the council (to be held not less than seven nor more than ten days before such election) for the purpose of correcting said official list, and at such meeting or any adjournment thereof the council shall make such additions or eliminations or both as ascertained facts shall require. The official list as corrected shall constitute the final and authoritative determination of the qualified registered voters who are also freeholders for such election."

The Circuit Court of Fairfax County, pursuant to a resolution of the city council, ordered that a special election of the qualified voters be held on November 8, 1960, in conjunction with the general election, to vote upon the bond ordinance adopted by the city council.

Pursuant to § 7.06, *supra*, council ascertained and recorded an official list of the names of registered qualified voters who were also freeholders in the City of Falls Church. On the front page of this list was a notice of the election and notice that on October 31, 1960, at 8 p.m. council would meet at the City Hall for the purpose of correcting the list, at which time registered qualified freeholders might appear to have names added to or eliminated from the list. The notice and list were duly posted and between 50 and 75 copies were distributed generally. At the designated meeting of council new names were added, one was eliminated, and the spelling of others was corrected. It was then resolved that the list as corrected be the official list of registered qualified voters who were freeholders in the city.

Upon recommendation of the Electoral Board, the city council provided for the installation of automatic voting machines in each of the four wards for the special and general elections. The type of

machine used had been approved by the State Board of Elections on January 5, 1950, (§ 24-293) and had been used by Arlington county in various elections. A considerable time prior to the elections public meetings were held to acquaint the electorate with the operation of the machine, at which times the manufacturer's representative was present. The machine was also demonstrated in various sections of the city. About 5,000 pamphlets concerning its operation, published by the manufacturer, were distributed.

Sample ballots with instructions thereon for voting on the machine were supplied at each voting ward on election day. During the early hours of voting some of the wards used separate machines for freeholders and non-freeholders, but as voting became heavy both freeholders and non-freeholders voted on the same machine. This was accomplished by the assistance of an election judge stationed by the machine. He would move a device on the outside of it, known as a "primary lever", into separate positions to record the votes of freeholders and non-freeholders.

On November 10, 1960, two days after the election, the Commissioners of Election met and canvassed the vote on the bond ordinance and certified that a total of 2788 had been cast. Of that number 1075 freeholders voted for approval of the ordinance and the issuance of the bonds and 1010 freeholders voted in the negative. They also reported that 481 non-freeholders voted in the affirmative and 222 in the negative on the issue presented. Thus by their tabulations a majority of all votes cast as well as a majority of freeholder votes cast approved the ordinance and the issuance of the bonds.

The separate freeholder poll books showed that 2286 freeholders registered and voted in the bond election, which was 201 votes more than the Commissioners of Election reported had been cast.

It is not contested that a majority of the non-freeholders voted for the bond ordinance. Moreover, plaintiffs do not charge fraud in connection with the election.

Plaintiffs resolve their assignments of error into the following questions:

"(1) Was there a majority of Freeholders in favor of the bond issue in view of the unaccounted for, or missing, votes as shown by official poll books?

"(2) Would the results of the election have been different if an admittedly incorrect list had not been prepared by the City, and an admitted 91 votes illegally cast, or illegally rejected?

"(3) Were distinct and separate objects submitted to the voters

in combination as a single proposition, and was the question on the ballot misleading and incomplete, and, if so, should the election be declared invalid?

"(4) Were the machines, as used and equipped in a special election, a proper substitute for separate ballot boxes for Freeholders and Non-Freeholders, and could a proper canvass have been made?"

The questions will be discussed in the order stated above.

Plaintiffs maintain that there was not a majority of freeholders in favor of the bond ordinance in view of the fact that 201 votes were missing or unaccounted for as shown by the poll books. They point out that the report of the Commissioners of Election shows a majority of 65 freeholder votes were cast in favor of the bond ordinance; that the 201 freeholder votes unaccounted for could alter the outcome of the election, and that it is reasonable to conclude that the unaccounted for votes "resulted from the device on the outside of the machine which was manipulated by officials to permit Freeholders or Non-Freeholders to vote as the case might be." They further argue that since the poll books showed a total of 2286 persons registered and voted as freeholders the necessary number of votes in favor of the bond ordinance to constitute a majority would be 1144, whereas only 1075 freeholders voted for it according to the Commissioners of Election.

As has been said, the bond ordinance election was held in conjunction with the general election. It is significant that 3221 electors in the City of Falls Church cast their votes in the presidential election or 433 more than voted on the bond ordinance. At the same time there were two constitutional questions to be voted upon. On the first question 2174 electors voted and on the second 2073 voted, or approximately 600 and 700 respectively less than the number of votes cast on the bond ordinance question. Moreover, a number of electors who voted by absentee ballot did not vote on the bond ordinance. Thus we see that a considerable number of electors did not vote on all questions or issues. It is reasonable to conclude that the 201 unaccounted for freeholder voters who were registered in the freeholder poll books as voting before they approached the voting machine did not exercise their franchise on the bond ordinance issue, and this they had a right to do. We hold that there was a majority of freeholders who voted for the approval of the bond ordinance and the issuance of bonds authorized thereby, regardless of the discrepancy between the freeholder poll books and the report of the Commissioners of Election.

■ We turn next to a consideration of plaintiffs' contention that the result of the election would have been different if an incorrect list of freeholders had not been prepared by the city and 91 votes had not been illegally cast or rejected.

The list of registered qualified voters who were also freeholders, which council caused to be prepared as required by § 7.06 of the city charter, *supra*, was not current. It included only those freeholders on the tax rolls as of January 15, 1960. Council was cognizant of the fact that the list was not accurate and up to date. The evidence shows that the voter registration books and the land record cards in the office of the Commissioner of Revenue were used for compiling the list, and that the Comissioner of Revenue did not transfer information received at intervals from the Clerk of the Court to the land cards or tax records until the end of each year. Harry E. Wells, city clerk and registrar, who assisted in preparing the list, stated at the meeting of council when the list was corrected and adopted as the final list, "It's impossible for me or anyone else ever to have an accurate freeholders' list." He further said: "I feel that it is as good a list as we have ever put out; however, I know it's inaccurate tonight."

Here the posting of the list and notice of the meeting of council for the purpose of correcting such list complied with the provisions relating thereto in § 7.06 of the charter. That section also provides that the "official list as corrected shall constitute the final and authoritative determination of the qualified registered voters who are also freeholders for such election". The purpose and object of requiring the posting of the list and notice of a meeting of council to correct it was to afford an opportunity to any interested person to appear and point out any inaccuracies or names that should be added or eliminated before the list became "final and authoritative." Neither plaintiffs nor any of the affected voters appeared at the meeting to suggest corrections in the list about which plaintiffs complain and it was too late for them to challenge it after it became "final and authoritative" under the provisions of the charter.

The trial court found that there were 15 freeholders who were on the official list of freeholders and recorded as having voted as non-freeholders; that there were 22 persons on the city tax rolls as freeholders, but not on the official list, who voted as non-freeholders; that there were 20 new freeholders who were not on the official list, and voted as non-freeholders, and that there were 34 persons who had ceased to be freeholders, but were on the official list and voted as

freeholders. The plaintiffs contend that these 91 votes were "illegal" and sufficient to change the results of and void the election.

The trial court properly held that the 15 freeholders who were on the official freeholders list and were recorded as having voted as non-freeholders had a bearing on the election contest, but that since that number of votes was not sufficient to affect the freeholder result the bond election should not be set aside on this ground. We also agree with the trial court's holding that the other 76 votes in the last three categories mentioned above could have no bearing on the election contest, because no attempt was made by the persons affected to have the discrepancies corrected before the official freeholders list became a "final and authoritative determination" of freeholders entitled to vote in the election.

■ Plaintiffs also contend that the bond ordinance election was invalid, because there were distinct and separate objects submitted to the voters as a single proposition, and that the ballot was misleading and incomplete.

The bond issue was for the purpose of providing funds for street improvements, storm drainage sewers, and school construction. The question submitted to the voters was worded as follows:

"Shall the Ordinance of the City of Falls Church, Virginia, entitled 'AN ORDINANCE AUTHORIZING THE ISSUANCE OF GENERAL OBLIGATION BONDS OF THE CITY OF FALLS CHURCH, VIRGINIA, IN THE AMOUNT OF ONE MILLION TWO HUNDRED THOUSAND DOLLARS ($1,200,000) FOR THE PURPOSE OF FINANCING CAPITAL IMPROVEMENT PROJECTS IN SAID CITY,' duly adopted by the Council of the City of Falls Church, Virginia, on September 12, 1960, be approved and shall the bonds authorized thereby be issued?"

The City of Falls Church is not required to issue its bonds under the general law, known as the "Public Finance Act of 1958", §§ 15-666.13, *et seq.* It has the authority to issue its bonds under the provisions of its charter. § 15-666.14. Since the city has proceeded under its charter, we must look to the provisions therein governing bond elections to decide whether the form of the ballot was sufficient.

Section 7.06 of the charter, *supra,* provides that "Upon adoption by the council of a bond ordinance" a special election shall be held to "approve the ordinance." The voters did not vote on the proposed bonds as such but voted instead on the ordinance which authorized the bond issue.

Section 7.08 of the charter as amended, specifically permits the combination of projects in one ordinance. It reads:

"An ordinance authorizing the issuance of bonds shall include a statement of the purpose or purposes of the issue, and if the purpose is to finance one or more capital improvement projects, it shall describe each of them sufficiently for purposes of identification, * * *."

Each of the capital improvement projects was sufficiently identified and described in the ordinance itself and the estimated cost for each improvement was stated therein.

In *Williamson* v. *Town of Graham*, 113 Va. 449, 74 S. E. 393, the election was ordered to determine whether bonds in the amount of $50,000 should be issued for the construction of a school building, improvement of water works, sidewalks and sewers. It was contended by Williamson, as plaintiffs contend here, that the ballots should have given the voters the opportunity to vote for or against the appropriation for each of the improvements whereas the ballots required them to vote for or against the entire issue. This contention was rejected and the combination of the several projects was upheld for the reason that the governing statute did not require separation.

In the present case the charter provisions, enacted by the General Assembly, permit the combination of several capital improvement projects in one ordinance, and do not require that each of the projects be stated separately on the ballot. The question presented to the voters was whether the ordinance should be approved and the bonds thereby authorized be issued. We find no reversible error in the form of the ballot that submitted the question.

■ Finally, plaintiffs say that the voting machines employed were not a proper substitute for separate ballot boxes for freeholders and non-freeholders, and that a proper canvass could not have been made as required by § 7.06 of the charter, as amended, which reads in part:

"The election officials shall provide a separate ballot box for qualified voters who are also freeholders in the city, and a separate ballot box for qualified voters who are not freeholders in the city. The ballots thus voted shall be first canvassed separately before being totaled to determine whether a majority of the votes cast approve the ordinance."

Counties, cities and towns are authorized to use voting machines at elections. § 24-291, *et seq.*; § 37, Constitution of Virginia. In the use of such machines, there are no ballots to deposit in ballot boxes, and consequently such boxes are not needed. In light of the broad nature of authority granted by the statutes relating to the use of the machines,

and in view of the fact that freeholder votes and non-freeholder votes were recorded separately on the machines, we are of opinion that their use was permissible under the provisions of the city charter and the applicable statutes.

Plaintiffs argue that by having an election official set the "primary lever" on the outside of the machine to positions for freeholders and non-freeholders to vote separately renders the procedure invalid as interposing a third party between the voter and his ballot. The General Assembly has recognized that some personal element is involved with regard to machine voting for it has authorized the employment of custodians for the purpose of "placing ballots in the frames of the machine, putting it in order, setting, testing, adjusting, and delivering the machine." § 24-299.

We think that the use of an election official to set the primary lever correctly for separate voting of freeholders and non-freeholders was within the purview of the statutes relating to machine voting. Moreover, after the primary lever has been placed in its correct position for voting according to the voter's status, the elector in privacy turns down voting pointers which indicate his choice on the issues and then registers his vote by pulling the operating lever to the left as far as it will go. The machine was demonstrated to the trial judge by the manufacturer's representative, and the judge observed in his opinion: "An actual test showed to my satisfaction that a voter could not vote as a freeholder if the lever was in the non-freeholder position, and *vice-versa*." We hold that by the use of the voting machines a proper canvass could be and was made of the votes cast.

Section 15-666.62, Code 1950, as amended, provides:

"No court in which a proceeding to invalidate or sustain bonds is brought shall invalidate the bonds unless it finds substantial defects, material errors and omissions in the incidents of such bond issue. Matters of form shall be disregarded." *Taxpayers* v. *Board of Supervisors*, 202 Va. 462, 471, 117 S. E. 2d 753.

In the present case we find no substantial defects, material errors and omissions in the incidents of the bond ordinance election, and the judgment appealed from is

*Affirmed.*