437 P.2d 143

STATE of New Mexico ex rel. Boston E. WITT, Attorney General, Petitioner,

v.

The STATE CANVASSING BOARD, Hon. David F. Cargo, Hon. David Chavez, Jr., and Hon. Ernestine Evans, Constituting the members of the Board, Respondents.

No. 8554.

Supreme Court of New Mexico.
Feb. 5, 1968.

As adopted by the convention the following provisions pertinent to this litigation were contained therein:

"ARTICLE VII

"Section 1. Every male citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons, persons convicted of a felonious or infamous crime unless restored to political rights, and Indians not taxed, shall be qualified to vote at all elections for public officers. All school elections shall be held at different times from other elections. Women possessing the qualifications prescribed in this section for male electors shall be qualified electors at all such school elections; provided, that if a majority of the qualified voters of any school district shall, not less than thirty days before any school election, present a petition to the board of county commissioners against women suffrage in such district, the provisions of this section relating to woman suffrage shall be suspended therein, and such provisions shall become again operative only upon the filing with said board of a petition signed by a majority of the qualified voters favoring the restoration thereof. The board of county commissioners shall certify the suspension or restoration of such suffrage to the proper school district.

"The legislature shall have the power to require the registration of the qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections and guard against the abuse of elective franchise. Not more than two members of the board of registration and not more than two judges of election shall belong to the same

Boston E. Witt, Atty. Gen., David Sierra, Asst. Atty. Gen., John D. Donnell, James E. Thomson, Special Asst. Attys. Gen., for petitioner.

Allen C. Dewey, Jr., William A. Sloan, Albuquerque, for respondents.

## OPINION

MOISE, Justice.

Pursuant to authority of an Enabling Act of Congress,[1] during fifty days in the year 1910 commencing on October 3rd, one hundred duly elected delegates to a constitutional convention composed and adopted a draft constitution for submission to the qualified voters of New Mexico.

1. 36 Stats. at Lge. 557, ch. 310, 1910.

political party at the time of their appointment.

\* \* \* \* \* \*

"Sec. 3. The right of any citizen of the state to vote, hold office, or sit upon juries, shall never be restricted, abridged or impaired on account of religion, race, language or color, or inability to speak, read or write the English or Spanish languages except as may be otherwise provided in this Constitution; and the provisions of this section and of section one of this article shall never be amended except upon a vote of the people of this state in an election at which at least three-fourths of the electors voting in the whole state, and at least two-thirds of those voting in each county of the state, shall vote for such amendment."

Article XIX, Section 1, of the constitution, as proposed by the convention, read:

"Any amendment or amendments to this Constitution, may be proposed in either house of the legislature at any regular session thereof, and if two-thirds of all members elected to each of the two houses voting separately, shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays thereon; or any amendment or amendments to this Constitution may be proposed at the first regular session of the legislature held after the expiration of two years from the time this Constitution goes into effect, or at the regular session of the legislature convening each eighth year thereafter, and if a majority of all the members elected to each of the two houses voting separately at said sessions shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays thereon. The secretary of state shall cause any such amendment or amendments to be published in at least one newspaper in every county of the state where a newspaper is published, once each week, for four consecutive weeks, the last publication to be not less than two weeks prior to the next general election, at which time the said amendment or amendments shall be submitted to the electors of the state for their approval or rejection. If the same be ratified by a majority of the electors voting thereon and by an affirmative vote equal to at least forty per cent of all the votes cast at said election in the state and in at least one-half of the counties thereof, then, and not otherwise, such amendment or amendments shall become part of this Constitution. Not more than three amendments shall be submitted at one election, and if two or more amendments are proposed, they shall be so submitted as to enable the electors to vote on each of them separately; provided, that no amendment shall apply to or affect the provisions of sections one and three of article seven hereof on Elective Franchise, and sections eight and ten of article twelve hereof on Education unless it be proposed by a vote of three-fourths of the members elected to each house."

After a heated campaign, during which one of the most severe criticisms of the proposed constitution was that it was too difficult to amend[2], a sizeable majority voted in favor of its adoption at an election held January 12, 1911.

Upon presentation of the constitution as adopted to the Congress, the provisions of Art. XIX, Sec. 1, were looked upon with disfavor and accordingly, by resolution[3], the Congress directed that before the President of the United States should announce the results of the election therein provided for, an amended Article XIX should be submitted and voted upon. The method for conducting the election on the amendment was set forth in detail, including a provision that the ballot be printed "on paper of a blue tint" to distinguish it from the white ballots provided for voting on candidates for of-

---

2. Donnelly, The Government of New Mexico, 48 (1947).

3. Joint Resolution of August 21, 1911, No. 8, 37 Stats. at Lge., p. 39.

fice. The amendment, as submitted, read as follows:

"Any amendment or amendments to this Constitution may be proposed in either house of the legislature at any regular session thereof; and if a majority of all members elected to each of the two houses voting separately shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays thereon.

"The secretary of state shall cause any such amendment or amendments to be published in at least one newspaper in every county of the state, where a newspaper is published once each week, for four consecutive weeks, in English and Spanish when newspapers in both of said languages are published in such counties, the last publication to be not more than two weeks prior to the election at which time said amendment or amendments shall be submitted to the electors of the state for their approval or rejection; and the said amendment or amendments shall be voted upon at the next regular election held in said state after the adjournment of said legislature, at such time as said legislature may by law provide. If the same be ratified by a majority of the electors voting thereon such amendment or amendments shall become part of this Constitution. If two or more amendments are proposed, they shall be so submitted as to enable the electors to vote on each of them separately: Provided, That no amendment shall apply to or affect the provisions of sections one and three of article VII hereof, on elective franchise, and sections eight and ten of article XII hereof, on education, unless it be proposed by vote of three-fourths of the members elected to each house and be ratified by a vote of the people of this state in an election at which at least three-fourths of the electors voting in the whole state and at least two-thirds of those voting in each county in the state shall vote for such amendment."

At the regular election wherein officers were elected, held November 7, 1911, the "blue ballot" amendment, as it came to be known, was adopted.

A comparison of the original Art. XIX, Section 1, with the "blue ballot" amendment discloses a number of differences, to-wit: (1) whereas, except as to Sections 1 and 3 of Art. VII and Section 10 of Art. XII where three-fourths vote was required, the original provision required that a favorable vote of two-thirds of all members of each house of the legislature was needed to propose an amendment at all times other than at the first regular session of the legislature held after two years from the date the constitution became effective, and at the session held each eight years thereafter when only a majority vote was required, the "blue ballot" amendment reduced the number to a simple majority as to all provisions except Sections 1 and 3 of Art. VII and Section 8 (which was added) and Section 10 of Art. XII, where three-fourths was still required; (2) the "blue ballot" amendment removed the requirement that ratification be by a vote equal to forty percent of all votes cast at the election and in at least one-half of the counties, and substituted a simple majority vote, except as to the same two sections in each of two articles; (3) the limitation of not more than three amendments to be submitted at any one election was eliminated; (4) whereas, the original provision had no limitation on the vote required to ratify, the "blue ballot" amendment included the limitation already provided in Art. VII Sections 1 and 3, applicable to them, and to Art. XII, Section 10, and extended it to also include Art. XII, Section 8.

In 1935, more than thirty-two years ago, only New Mexico and Kentucky had no provision for absentee voting.[4] We are advised New Mexico today stands alone without such a provision.

4. Donnelly, The Absentee Voter Problem in New Mexico, 7 N.M.Bus.Rev. 91 (1938).

Since adoption of the constitution, and admission into the union, no less than ten unsuccessful attempts were made prior to 1967 to amend the constitution so as to make absentee voting possible. The hopelessness of the situation gave rise to the description of Art. VII, Section 1, as "the unamendable section." [5] Every proposed amendment received more than a majority of favorable votes at the election wherein it was submitted, and in 1958 the proposed amendment was approved by 78% and in 1964 by 81.8% of those voting on it. [6] However, because of the requirement of the two-thirds majority in every county, the amendment failed. In 1964 only one county [7] did not give a favorable majority and only six [8] gave less than the required two-thirds. The total vote was 106,579 in favor and 23,694 opposed. [9]

An eleventh effort to amend was made in 1967. Respondents admit that at a special election held November 7, 1967, there were 42,101 votes in favor of amending the section and 9,757 opposed, or a percentage of 81.1851 favorable votes. Again, however, in one county [10] less than a majority voting on the amendment favored it, and in twelve [11] less than two-thirds approved it. [12] Thus it is seen that a change of 634 votes in twelve counties was needed to meet the requirement of Art. VII, Sec. 3, and Art. XIX, Sec. 1. But, more serious and important, the votes changed had to be not less than the number indicated in each of the named counties. As a matter of fact, it is apparent that if all the counties, except Rio Arriba, had voted the two-thirds majority,

and the vote remained unchanged in that one county, the amendment would have been lost, notwithstanding a vote of over 81%, and more than 3308 votes in excess of the required three-fourths favorable statewide vote. Also, it is apparent that the failure to receive two-thirds vote in Harding County where the total vote was 135 could successfully frustrate the wishes of 90.3 percent of the 13,659 voting in Bernalillo County, thereby giving a Harding County vote more than 100 times the weight of a Bernalillo County vote.

It should also be mentioned that over the years several attempts have been made by the legislature to enact an absentee voting law. Because of the interpretation placed by this court on Art. VII, Section 1, N.M. Const., these efforts have been uniformly held unconstitutional. [13]

This brief review should serve to demonstrate the effect of the requirement of a two-thirds majority in each and every county to adopt an amendment to Art. VII, Section 1. It also serves as a basis for the discussion to follow.

In the light of the decisions cited above, it is eminently clear that no statute authorizing absentee voting could be expected to be upheld unless and until Art. VII, Sec. 1, is amended. It is no less clear, as already noted, that amendment is impossible until some new approach to the problem is made. In the Reapportionment cases decided from 1962 to 1964, hereinafter cited, is found a group of decisions supporting a line of rea-

5. New Mexico Legislative Council Service, The Unamendable Section (1965).

6. Folmar, New Mexico Legislative Council Service, Piecemeal Amendment of the New Mexico Constitution, 1911 to 1967 (4th Rev.1968).

7. Guadalupe

8. Guadalupe, Harding, Mora, Quay, Torrance and Union

9. Id. Footnote 5.

10. Sandoval

11. Catron [12]; Grant [57]; Guadalupe [18]; Harding [12]; Hidalgo [16];

Mora [35]; Rio Arriba [1]; Sandoval [111]; San Miguel [206]; Taos [30]; Union [17] and Valencia [109]. The numbers set forth in brackets following each county name indicate how many votes short of a two-thirds vote in favor was given by those voting thereon.

12. Id. Footnote 6.

13. Thompson v. Scheier, 40 N.M. 199, 57 P.2d 293 (1936); Baca v. Ortiz, 40 N.M. 435, 61 P.2d 320 (1936); Chase v. Lujan, 48 N.M. 261, 149 P.2d 1003 (1944); State ex rel. West v. Thomas, 62 N.M. 103, 305 P.2d 376 (1956).

soning hitherto never advanced. Petitioner's principal reliance is placed on these authorities.

The instant original proceeding was brought by the attorney general and asks that the state canvassing board, whose duty it is to canvass the vote on constitutional amendments and declare the result, § 3–6–19, N.M.S.A. 1953, be mandamused to certify Proposition 7, amending Art. VII, Sec. 1, as passed, and asserts that Art. VII, Sec. 3, insofar as it requires a favorable vote of not less than two-thirds of those voting in each county to amend Art. VII, Sec. 1, is unconstitutional. We issued our alternative writ directed to the canvassing board who thereupon held in abeyance their canvass of the vote on Proposition 7, pending our ruling. The canvassing board requested this court to appoint counsel to represent them and we accordingly appointed Wm. A. Sloan, Esq., and Allen Dewey, Esq., (both of Albuquerque) to appear herein as amici curiae on their behalf. We take this opportunity to express appreciation to counsel for the very excellent briefs filed by them, and for their contribution to the solution of the very important and intriguing problems presented. They have been most helpful.

Proposition 7, as it appeared on the ballot at the November 7, 1967 special election, proposed that Art. VII. Sec. 1, be amended to read as follows:

"Every citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons, and persons convicted of a felonious or infamous crime unless restored to political rights, shall be qualified to vote at all elections for public officers. The legislature may enact laws providing for absentee voting by qualified electors. All school elections shall be held at different times from other elections.

"The legislature shall have the power to require the registration of the qualified electors as a requisite for voting, and shall regulate the manner, time and places of voting. The legislature shall enact such laws as will secure the secrecy of the ballot, the purity of elections, and guard against the abuse of elective franchise. Not more than two members of the board of registration, and not more than two judges of election shall belong to the same political party at the time of their appointment."

The position of Petitioner, generally concurred in by counsel for Respondents, that the requirement of Art. VII, Sec. 3, of a two-thirds favorable vote in each county of the state in order to amend Art. VII, Sec. 1, denies equal protection of the laws to certain citizens of the state, contrary to the Fourteenth Amendment to the Constitution of the United States. Amici, in their argument, also discuss the effect of Art. XIX, Sec. 1, under the decisions relied upon.

Support for the argument is found principally in the so-called Reapportionment Cases, starting with Baker v. Carr [14], followed by Gray v. Sanders [15], and then by Reynolds v. Sims [16]; WMCA, Inc. v. Lomenzo [17]; Maryland Committee v. Tawes [18]; Davis v. Mann [19]; Roman v. Sincock [20]; Lucas v. Forty-Fourth General Assembly of State of Colorado [21], all decided June 15, 1964.

14. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

15. 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

16. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506.

17. 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed. 2d 568.

18. 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed. 2d 595.

19. 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed. 2d 609.

20. 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620.

21. 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632.

All of these cases deal with legislative reapportionment, not with voting rights relating to amendment of a constitution. However we perceive of no real distinction which can or should be drawn.

As already pointed out, a vote in Harding County actually off-set or counted for more than 100 votes in Bernalillo County. This is exactly what was said in Gray v. Sanders, supra, could not be sustained in elections for legislators. We quote:

"If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote, none could successfully contend that that discrimination was allowable. * * * *How then can one person be given twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. * * * *" (Emphasis added.)

Concerning the right to give to votes of residents of geographical areas of widely varying population equivalently disproportionate weight, the United States Supreme Court had the following to say, in Reynolds v. Sims, supra:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. * * * Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.

"History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures. So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. * * * *" (Emphasis added.)

We see no escape from the conclusion that a requirement of a two-thirds favorable vote in every county, when there is a wide disparity in population among counties, must result in greatly disproportionate values to votes in the different counties. Where, as here, a vote in Harding County outweighs a hundred votes in Bernalillo County, the "one person, one vote" concept announced in Gray v. Sanders, supra, certainly is not met. Al-

though this example provides the extremes that are present, Bernalillo County having more than four times the population of Dona Ana County, the next most populous county in 1960, no situation could be projected where the Bernalillo County voter would not be substantially discriminated against merely by virtue of the fact that artificial geographical lines of counties determine the value of a vote.

■ As stated in Reynolds v. Sims, supra:

"Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. * * *"

The following additional quotations from Reynolds v. Sims, supra, are equally illuminating, and although used in discussing elections of legislative representatives, are nevertheless particularly applicable here:

"To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban. Representation schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives. * * *"

" * * * [I]f a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. * * *"

The only case of which we are aware in which a constitutional limitation at all comparable to that here being discussed was involved is Holt v. Richardson[22], wherein a three-judge court considered a section of the constitution of Hawaii providing in effect that representation in the state senate could not be changed unless "approved by a majority of the votes tallied upon the question in each of a majority of the counties." The case is not very helpful because the court there noted that the senatorial apportionment in the Hawaii constitution was unquestionably invalid under Reynolds v. Sims, supra, and that the provisions concerning approval by more than one-half of those voting in each of a majority of the counties was likewise unconstitutional by virtue of its close ties to apportionment. On appeal, the United States Supreme Court merely noted that all parties conceded the unconstitutionality and accordingly did not discuss the provision. Burns v. Richardson[23].

■ We see no rational basis to distinguish between voting on representatives in the legislature, and voting on constitutional amendments. One is no more a necessary ingredient of our democratic

22. 238 F.Supp. 468 (D.Hawaii, 1965). ■

23. 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

process than the other. Nor can it be said that an equal voice in selection of the legislature is of greater importance to a citizen than equality of weight in expression of views on changes in our basic charter, the constitution. As a matter of fact, it is amply evident that the constitutional provision here being considered was quite definitely placed in the constitution to preserve certain rights 'in a minority group. It has now been made clear that when this is done there is no political equality under the Fourteenth Amendment as that term applies to the Fifteenth, Seventeenth, and Nineteenth Amendments to our United States Constitution. Gray v. Sanders, supra. Neither can there be political equality under the Fourteenth Amendment to exercise the right of elective franchise provided for in Art. VII of the New Mexico Constitution, so long as Art. VII, Sec. 3, and Art. XIX, Sec. 1, contain the restriction here under attack.

The application of the rule of the reapportionment cases to constitutional conventions has been considered in West v. Carr [24] and in State ex rel. Smith v. Gore [25]. Although in West v. Carr, supra, it was held that the decision in Baker v. Carr, supra, had no application to apportionment of a constitutional convention authorized by a vote of the people, in the course of the opinion we find the following stated by the court in West v. Carr, supra:

"As we have seen, the people of Tennessee, voting not by counties and districts, but voting in the State at large, in the November 6, 1962 election, voted for the convention, as provided and constituted by this Act. The legal effect of this vote was that the people made it their act, in all its terms, including the manner of choosing the delegates to the convention. Otherwise stated, this vote of the people of the State at large must be taken as an expression of their will and as their act and deed.

"In that election *every qualified voter in the State was entitled to vote and every vote was given the same weight, whether the voter resided in the largest urban county or the smallest rural county. There is no claim that there was any malapportionment or any debasement of any vote; nor can it be said that this Act, as thus ratified by the people of the State, deprived complainant or any other person of any right under the Constitution of Tennessee or of the United States.*

"This conclusion is reinforced when it is considered that neither the delegates nor the convention can take any final action, but are strictly limited to the subjects specified in the call, and as to them, can only make proposals which can have no effect unless and until they *are ratified in another election by a vote of the people of the State at large, where every qualified voter will be entitled to vote and every vote given the same weight."* (Emphasis added.)

It is clear from this language that the court relied on the effect of the vote of the people at elections where the vote of every elector had equal weight to overcome the inequality of representation found in the constitutional convention.

In State v. Gore, supra, the court held equal representation in a constitutional convention a requisite of the state constitution and expressed disagreement with the conclusion of the Tennessee court in West v. Carr, supra, concerning the applicability of the decision in Baker v. Carr, supra.

Having disposed of the problem of the requirement of a two-thirds vote in every county we next note the question of whether there was compliance with the requirement of ratification by at least "three-fourths of the electors voting in the whole state." No serious attack is made on the constitutionality of this provision. How-

24. 212 Tenn. 367, 370 S.W.2d 469 (1963), dismissed for lack of jurisdiction, 378 U.S. 557, 84 S.Ct. 1908, 12 L.Ed.2d 1034.

25. 150 W.Va. 71, 143 S.E.2d 791 (1965).

ever, our attention is directed to the fact which appears in the record that whereas a total of 51,858 votes were cast on Proposition 7, of which 42,101, or 81%, favored it, the total number who voted at the election was 56,152, and three-fourths of that number is 42,114. It has been suggested that the amendment thus failed by 13 votes to receive the vote of "three-fourths of the electors voting in the whole state" if the words "electors voting in the whole state" mean those voting on all propositions submitted at the election.

Quite obviously some ambiguity is present in the language used. Do the quoted words refer to the total number voting at the election so as to require approval by at least three-fourths of the largest number voting on any proposition submitted in the election, or do they merely refer to votes on the particular proposition? Some complication presents itself when it is noted that the three-fourths requirement appearing in Art. VII, Sec. 3; Art. XII, Sec. 10, and in Art. XIX, Sec. 1, relates to "electors voting in the whole state," whereas Art. XIX, Sec. 1, requires only a majority of the "electors voting thereon" to ratify amendments generally.

We are bound by long established principles of constitutional interpretation. In Todd v. Tierney[26], the court made the following pronouncements:

"What the framers of the Constitution intended as disclosed by the language employed is, of course, the interpretation properly to be given the instrument. That intent must be arrived at by construing together its various pertinent provisions and giving to each the meaning which its language most naturally suggests when considered in proper relationship to the others. We should, as nearly as we may, endeavor to look at the instrument from the vantage point of the framers the better to understand their view of the matter and the meaning likely intended. * * *

"We have spoken often in this opinion of the viewpoint of the framers of the Constitution and of what they intended by the language employed. And whenever we refer to the framers that term is to be taken as embracing the people who adopted it. We are not unmindful of the rule of construction applicable to a Constitution that its language is to be taken in its common and ordinary sense and as likely understood by the people who adopted it. * * *"

In State ex rel. Ward v. Romero[27], the court had the following to say:

"It is the duty of this court to interpret the various provisions of the Constitution to carry out the spirit of that instrument. We should not permit legal technicalities, and subtle niceties to control and thereby destroy what the framers of the Constitution intended. Where the spirit and intent of the instrument can be clearly ascertained, effect should be given to it, and the strict letter should not control if the letter leads to incongruous results, clearly not intended. * * *"

From the foregoing we recognize it as our responsibility to attempt to arrive at the meaning of the framers of the constitution and to give to their work an interpretation that is reasonable—not one that is illogical or incongruous.

■ While aware, as already noted, that the use of different words within the same provision might lead to a conclusion that different meanings were thereby intended, we should not lose sight of the fact that to construe "electors voting in the whole state" to in effect mean "all electors voting at the election" as distinguished from those voting on the particular amendment, would have the effect of making the "unamendable section" even more unamendable than would otherwise be true. To so hold would in effect attribute to the membership, of the convention, the Congress of the United States and the electorate who

26. 38 N.M. 15, 27 P.2d 991 (1933).

27. 17 N.M. 88, 125 P. 617 (1912).

ratified the constitution and the amendment to Art. XIX, the intention of incorporating provisions which ostensibly provide for amendment while in fact making it impossible. Notwithstanding that the restrictions were intended to make the particular provisions difficult of amendment, we cannot believe that it was the purpose to make it utterly impossible. As has been seen, the difficulties have been great, but we believe that to multiply the problems beyond those which naturally flow from the necessary meaning of language would amount to unreasonable interpretation and one not to be attributed to the drafters of the provision. Also, when it is remembered that Art. XIX, Sec. 1, was adopted as an amendment intended to generally make amendment less difficult, and that the three-fourths and two-thirds provisions were lifted bodily from Art. VII, Sec. 3, and Art. XII, Sec. 10, we do not believe that the argument favoring an interpretation which would make amendment more difficult is indicated or required. We find support for this approach in Board of County Comr's of Bernalillo County v. McCulloh [28].

In this connection, we would take note that, the last two times prior to 1967 when amendments to Art. VII, Sec. 1, to permit absentee voting, were submitted were in 1958 and 1964 at general elections. Whereas in 1958, there were 69,567 votes cast in favor and 19,061 against, being over 78% of those voting on the proposition, only 43.2% of those voting for governor at the election voted on the proposed amendment. Similarly, in 1964, also a general election, over 81% of those voting on the amendment favored it, although only 41% of those voting for governor expressed an opinion on the amendment.[29] It is thus quite evident that to hold that three-fourths of those voting at any given election is required to amend Art. VII, Sec. 1, would give effect as having cast negative votes to those voters at the election who because of negligence, lack of interest, or some other unexplained reason failed to register their votes on the particular proposition. No logical reason for counting as opposed those who do not express their preference has been suggested. Nevertheless, this is the effect of requiring a three-fourths majority of those voting at an election whether or not they voted on the particular proposition. It would have been just as reasonable if a three-fourths vote of all registered voters had been required, whether voting or not. Such a provision, we submit, would be unsound in any view, but more reasonable only in degree than the present contention here held to be without merit. Compare Davy v. McNeill [30], where we find the following language quoted:

"Ordinarily, the vote of voters who do not choose to participate in an election are not to be taken into consideration in declaring the result. * * * And so, a constitutional provision requiring the assent of two-thirds of the qualified voters of the county of any election lawfully held for that [sic] purpose of a proposed issue of municipal bonds, means two-thirds of the vote of the qualified voters present and voting at such election favorably as determined by the final return of the result."

See also Fabro v. Town of Gallup.[31]

Taking this view of the provisions, can the language be read so as to support a conclusion that nothing more was required than a favorable vote of three-fourths of those voting on Proposition 7? Although the question is one of first impression in New Mexico, other courts have had occasion to consider it. Also, it should be noted that in Baca v. Ortiz, supra, the court in determining that an insufficient number of votes had been cast to adopt the proposed amendment, the number of votes used to establish this fact were those cast on the particular amendment, and no consideration was given to whether the number to which

28. 52 N.M. 210, 195 P.2d 1005 (1948).

29. Id. Footnote 6.

30. 31 N.M. 7, 240 P. 482 (1925).

31. 15 N.M. 108, 103 P. 271 (1909).

the vote should be related was the total vote at the election.

While we have found no case involving a provision identical with our own, there are many which are similarly ambiguous and have accordingly required interpretation.[32] Generally speaking, the cases there cited pass upon the question of whether a constitutional provision or statute should be interpreted to require a majority of those voting on a proposition or a majority of those qualified to vote, whether voting or not, and support a conclusion that unless the constitution or law declares or clearly implies the contrary, qualified electors who do not present themselves to vote, or who do not vote on a proposition, are presumed to assent to the will of those who actually cast their ballots. Falls Church Taxpayers League v. City of Falls Church[33] is such a case. It held a bond issue to have been approved by "a majority of the qualified voters who are freeholders voting in such election" even though not favored by sufficient voters to equal a majority of the votes cast on other propositions at the same election. Ladd v. Yett[34] also holds that only those votes cast on a given proposition shall be considered in determining if a "majority of the qualified voters voting at said election" had voted in favor of each of several amendments to a city charter submitted at one election. See also, King v. City of McAlester[35]; Wilson v. Wasco County[36]; Harris v. Walker[37]. From Tinkel v. Griffin[38] we quote the following which we consider pertinent:

"It is the theory of our government that those electors control public affairs who take a sufficient interest therein to give expression to their views. Those who refrain from such expression are deemed to yield acquiescence. In a recent case the court of appeals of Kentucky, having

under consideration a similar constitutional provision, said: 'It is a fundamental principle in our system of government that its affairs are controlled by the consent of the governed, and, to that end, it is regarded as just and wise that a majority of those who are interested sufficiently to assemble at places provided by law for the purpose shall, by the expression of their opinion, direct the manner in which its affairs shall be conducted. When majorities are spoken of, it is meant a majority of those who feel an interest in the government, and who have opinions and wishes as to how it shall be conducted, and have the courage to express them. It has not been the policy of our government, in order to ascertain the wishes of the people, to count those who do not take sufficient interest in its affairs to vote upon questions submitted to them. It is a majority of those who are alive and active, and express their opinion, who direct the affairs of the government, not those who are silent and express no opinion in the manner provided by law, if they have any. Before reaching a conclusion that those who framed our fundamental law intended to change a well-settled policy by allowing the voter who is silent and expresses no opinion on a public question to be counted, the same as the one who takes an interest in and votes upon it, we should be satisfied that the language used clearly indicates such a purpose.' [Montgomery County] Fiscal Court v. Trimble [104 Ky. 629,] 47 S.W. 773, 42 L.R.A. 738. * * *"

We are not unmindful that contrary conclusions have been reached by some courts. Of this character, to cite a few, are People v. Stevenson[39]; State ex rel. Cope v. Foraker[40]; State ex rel. Stevenson v.

32. In 131 A.L.R. 1382 (1941) there is an annotation on the subject.

33. 203 Va. 604, 125 S.E.2d 817 (1962).

34. 273 S.W. 1006 (Tex.Civ.App.1925).

35. 273 P.2d 139 (Okl.1954).

36. 83 Or. 147, 163 P. 317 (1917).

37. 199 Ala. 51, 74 So. 40 (1917).

38. 26 Mont. 426, 68 P. 859 (1902).

39. 281 Ill. 17, 117 N.E. 747 (1917).

40. 46 Ohio St. 677, 23 N.E. 491 (1890).

Babcock[41]. There are others, but to cite them would add little to the opinion.

For the reasons stated, we conclude that the requirement of "at least three-fourths of the electors voting in the whole state" was met when that percentage voting on the particular proposition favored it, notwithstanding the fact that this constituted less than three-fourths of all those voting at the election on some other propositions.

The requirement of a two-thirds vote in each county being unconstitutional, and the demand of ratification by "at least three-fourths of the electors voting in the whole state" having been met, the adoption of constitutional amendment submitted as Amendment No. 7 at the election held November 7, 1967 was accomplished. It follows that it should be certified by respondents as having been ratified, to accomplish which the alternative writ heretofore issued is made permanent. It is so ordered.

NOBLE, COMPTON and CARMODY, JJ., and LaFEL E. OMAN, J., Ct.App., concur.

---

41. 17 Neb. 188, 22 N.W. 372 (1885).